ANDREW MAJERCIN, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Northern Petrochemical Company, Appellee).

Third District (Industrial Commission Division)  No. 3—87—0235WC

Opinion filed April 4, 1988.—Rehearing denied May 16, 1988.

Emmanuel F. Guyon, of Streator, for appellant.

Anthony J. Caruso, Jr., of Discipio, Caruso & Simard, of Chicago, for appellee.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

The petitioner, Andrew Majercin, filed a claim under the Workmen's Compensation Act (the Act) (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 *et seq.*) to recover benefits for disability against Northern Petrochemical Company (the company). The arbitrator awarded the petitioner temporary total disability and benefits for the permanent partial loss of the use of each leg. On review, the Industrial Commission reversed the arbitrator's decision and denied compensation. The circuit court of Grundy County confirmed the decision of the Commission. The petitioner brings this appeal. We affirm.

At the hearing before the arbitrator, the petitioner testified to the following. The petitioner graduated from high school in 1964. He worked for the Clow Corporation from 1964 to 1965 and then for Owens-Illinois Glass Company from 1965 to 1966. From 1966 to 1969 the petitioner served in the United States Air Force. After his discharge from the service, the petitioner returned to Owens-Illinois Glass Company until August of 1970, when he left to attend a year of college.

The petitioner began working for the respondent, Northern Petrochemical Company, in 1971. He worked for three years as a maintenance technician and then until 1978 on an insulation crew. His duties involved considerable climbing of stairs and towers. It also involved considerable amounts of kneeling on concrete or gravel and in tight places such as pipe racks.

The petitioner began experiencing pain in his knees in late 1976. The last day the petitioner worked was on January 4, 1978. Prior to that date, the petitioner had related his knee problems to his supervisor, Ray Gaddo. At two plant safety meetings at which Gaddo was present, the petitioner requested knee pads. The petitioner also discussed his knee problems in at least three private conversations with Gaddo.

Because of increasing pain, the petitioner came under the care of Dr. Bok Choi, an orthopedic surgeon. Dr. Choi performed surgery on

the petitioner's right knee on January 6, 1978, and on the petitioner's left knee in March of 1978. Following his two knee operations, the petitioner experienced relief for about eight months. The petitioner returned to work in May of 1978. By the end of 1978, the pain returned and grew progressively worse. In December of 1979, the petitioner went to see Dr. U. K. Sinha. Dr. Sinha recommended surgery. The doctor operated on the petitioner's right knee in February of 1980.

In August of 1980, Dr. Sinha gave the petitioner a release to return to work with a limited duties restriction. When the petitioner attempted to return to work, the respondent sent him to be examined by Dr. Jon Nicosia. About a week later, the petitioner had a meeting with Jim Street, the respondent's industrial relations representative. Street told the petitioner that Dr. Nicosia agreed with Dr. Sinha's work restrictions. Street then explained that because the restrictions would not allow the petitioner to fully perform his job, the company was going to place him on long-term disability.

The petitioner has not returned to work at the company since August of 1980. However, according to the petitioner, the respondent permitted him to bid on other jobs that he felt he was qualified to perform. The petitioner placed bids on five jobs but was unable to secure any of the positions in question.

The petitioner testified that he has constant pain in both knees, the right more than the left. He hears a loud, cracking sound in his right knee when he climbs stairs and in the morning when he gets up. He has numbness on the right side of his right leg. His right knee begins to throb when he sits with his knees bent for a long period. The petitioner's knees, especially the right, begin to hurt when he stands for an extended time. He experiences considerable pain when he puts his full weight on his right leg. The petitioner feels a grating sensation in his knees when he climbs stairs.

On cross-examination, the petitioner admitted that he exercised with weights, lifting from 1966 to 1969, and again from 1972 to 1975. As a part of his exercises, he would bench-press and squat 200 to 250 pounds, repeatedly lowering himself into a stooping position on both knees. He did not feel any pain in his knees during these exercises. The petitioner also admitted that at one time he struck his knees against some pipes while he was climbing a pipe rack at the respondent's plant. He did not indicate that he broke the skin of either knee.

Ray Gaddo testified that he was the petitioner's supervisor for about seven years. According to Gaddo, the petitioner had mentioned

more than once over a two-year period that his knees were bothering him. Gaddo could not recall that the petitioner had ever stated that he had struck his knees.

The petitioner introduced into evidence a number of documents from physicians who had examined him. According to Dr. Choi's medical records, the doctor treated the petitioner from December of 1977 to January of 1980. He diagnosed the petitioner with chondromalacia of the patella, or the softening of cartilage, in both knees. In 1980, at Dr. Choi's last examination of the petitioner, the petitioner related to the doctor that he was not able to kneel and that he was experiencing pain, especially with activity.

Dr. James Wilson set forth in his report that he examined the petitioner on June 8, 1979. Dr. Wilson found a normal range of motion in both knees. The doctor noted that there was patellofemoral crepitation in both knees. It was the doctor's impression that the petitioner had symptoms from medial compartment arthritis of both knees with degenerative arthritis of the patellofemoral joint. Dr. Wilson again examined the petitioner on July 1, 1981. According to the doctor, the petitioner continued to have pain, swelling in both knees and difficulty in performing some normal activities of daily living. It was the doctor's impression that the petitioner suffered an injury to his right and left knees which necessitated right and left medial meniscectomies.

The report of Dr. Robert Mussey showed that he examined the petitioner on August 6, 1979. The petitioner related to him that he was experiencing pain, his knees felt weak and he could not kneel well. The doctor opined that the petitioner had mild chondromalacia of both knees and suggested that he change jobs.

The reports of Dr. U. K. Sinha were admitted. According to a February 2, 1980, report, the petitioner had "chondromalacia patella," apparently in both knees. In a May 29, 1980, report, Dr. Sinha stated that he examined the petitioner again. The doctor opined that at that time, the petitioner's main symptoms were diffused pain over the patella region, a very tender medial facet on both sides especially when he knelt, and a mild abnormal sublaxation of the patella on both sides. In his work release for the petitioner, Dr. Sinha stated that the petitioner should avoid climbing, kneeling and any other type of labor involving extreme flexion of the right knee. The petitioner was to limit his work to an eight-hour day and was to be at a desk job if at all possible.

Dr. David Coynik examined the petitioner on August 23, 1980. In his report, the doctor observed -10% to +150% flexion of the left

knee without pain and +10% to 120% flexion of the right knee. He noticed an audible click in one of the knees. The doctor also observed an area of decreasing sensitivity to sharp pain on the lateral aspect of the right knee. It was Dr. Coynik's impression that the "history and physical examination are consistent" and that the petitioner had chondromalacia patellae.

After the petitioner concluded presenting evidence, the arbitrator asked counsel for the petitioner whether, if his doctors were called to testify, they would give the opinion that the petitioner's condition was causally connected to his employment. Counsel responded in the affirmative. However, the respondent objected to this characterization of the evidence. The arbitrator did not rule on the respondent's objection.

The respondent offered into evidence the medical report of Dr. M. Chapman concerning his examination of the petitioner on June 26, 1980. Dr. Chapman observed that the petitioner's right knee was swollen one inch larger than the left knee, and that the petitioner had limited mobility in squatting. It was the doctor's opinion that the petitioner had limitation of flexion of the right knee.

In its decision, the arbitrator construed the petitioner's work activities as a repetitive assault on his knees constituting an accident arising out of and in the course of his employment. The arbitrator awarded the petitioner temporary total disability for 26 weeks and permanent partial disability for a 15% loss of use of each leg.

On review, the parties presented no new evidence to the Industrial Commission. The Commission reversed the finding and the award of the arbitrator. The Commission found: (1) that the petitioner failed to show a causal relationship between his condition and any accident; (2) that the petitioner failed to establish a particular event as the accident causing his condition; and (3) that even if the repetitive assault theory were appropriate, the evidence failed to show either a sufficiently specific type, degree or frequency of repeated activities, or medical opinion to support the petitioner's claim. The circuit court confirmed the Commission's decision.

■ On appeal, the petitioner initially notes that while the Commission's instant decision was signed by three Commissioners, two of the Commissioners acknowledged in a specially concurring opinion that they were not members of the panel when oral arguments were heard and a majority decision was reached. The petitioner argues that the requirements of *Zeigler v. Industrial Comm'n* (1972), 51 Ill. 2d 137, 281 N.E.2d 342, where the supreme court permitted three new Commissioners who had not heard oral arguments to sign a

written decision, were not met and that as a consequence the Commission's decision was faulty. However, as the petitioner is raising this issue for the first time on appeal, it is waived. *Chambers v. Industrial Comm'n* (1985), 139 Ill. App. 3d 550, 487 N.E.2d 1142.

In his main argument, the petitioner raises three issues. His first two issues are whether the finding of the Industrial Commission was against the manifest weight of the evidence and whether he was entitled to judgment as a matter of law. The petitioner argues that the evidence overwhelmingly shows that he is entitled to an award of benefits. The petitioner maintains that the entirety of the medical evidence establishes his medical condition and suggests that he cannot return to his former employment. The petitioner points out that the respondent placed him on long-term disability because his medical restrictions would not permit him to fulfill his duties. He also notes that the respondent introduced no evidence to rebut causation. The respondent counters that the petitioner failed to present adequate medical evidence as to the causal connection between his condition of ill-being and his employment.

■ A workers' compensation claimant has the burden of proving that his employment was a causative factor of his physical disability. (*Westinghouse Electric Co. v. Industrial Comm'n* (1976), 64 Ill. 2d 244, 356 N.E.2d 28.) Determining the nature and extent of an injury is primarily the responsibility of the Industrial Commission. (*Wallace v. Industrial Comm'n* (1983), 98 Ill. 2d 33, 455 N.E.2d 92.) Because of the Commission's expertise in the area of workers' compensation, its finding on the question of disability should be given substantial deference. (*Board of Education v. Industrial Comm'n* (1983), 96 Ill. 2d 239, 449 N.E.2d 839.) It is for the Commission to resolve disputes in the evidence and to draw reasonable inferences and conclusions from that evidence. The Commission's decision may not be set aside on review unless it is contrary to the manifest weight of the evidence. *Glover v. Industrial Comm'n* (1985), 140 Ill. App. 3d 361, 485 N.E.2d 605.

In the case at bar, the Commission noted in its decision that other than Dr. Coynik's impression that "[t]he history and physical examination are consistent," none of the examining doctors expressed a medical opinion as to the causal connection between the condition of the petitioner's knees and the petitioner's employment with the respondent. The Commission stated that the assertion by the petitioner's attorney, that his doctors would specifically testify that there was a causal connection, did not constitute evidence.

From the record, there is little doubt that the petitioner's condi-

tion is serious. However, the only evidence showing causal connection was the petitioner's claim that his knee problems stemmed from his constant kneeling on concrete and gravel at work. No doctor stated an opinion that established the petitioner's job as the cause of his condition. There was also evidence from which the Commission could have reasonably inferred that the petitioner's condition was caused by his weightlifting, where he repeatedly went down on his knees. We find that the Commission's conclusion that the petitioner failed to prove the requisite causal connection was not against the manifest weight of the evidence.

■■ We so find notwithstanding the respondent's failure to introduce rebuttal evidence. The petitioner's authority of *Kerz v. Industrial Comm'n* (1972), 51 Ill. 2d 319, 282 N.E.2d 710, is inapplicable here, where the petitioner's only evidence showing a causal relationship was his testimony that his condition did not develop until after he began working for the respondent.

■ The petitioner's final issue is whether the decision in *Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, 505 N.E.2d 1026, has changed the law upon which the Commission based its decision. The petitioner contends that the Commission based its decision upon *International Harvester Co. v. Industrial Comm'n* (1973), 56 Ill. 2d 84, 305 N.E.2d 529, which has since been overruled by *Belwood*. According to the petitioner he established an accidental injury under the "repetitive trauma" theory, as a claimant may now do following *Belwood*.

In *International Harvester*, the supreme court held that to establish an "accidental injury," a claimant must trace that injury to a definite time, place and cause. However, in *Belwood,* the supreme court held that an employee could be accidentally injured as a result of repetitive, work-related trauma without one identifiable instance of injury or collapse. It should be noted that in *Belwood* the court did not overrule the "accidental injury" rule in *International Harvester*. On the contrary, the supreme court held that "repetitive trauma" should be included in the definition of "accidental injury" as set forth in *International Harvester*.

We note that in denying the petitioner's claim the Commission did consider a repetitive trauma analysis. Even if it had not done so, the petitioner's argument would lack merit. Although the petitioner presented evidence that his condition developed gradually, as stated previously and unlike the *Belwood* claimant, the petitioner failed to present the impression of any physician or other evidence to support a causal connection between his injury and his employment. We find

that the petitioner has failed to establish an accidental injury under the repetitive trauma theory.

Accordingly, the judgment of the circuit court of Grundy County is affirmed.

Affirmed.

McNAMARA, WOODWARD, McCULLOUGH, and CALVO, JJ., concur.