DALE DARLING, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*
(Crane Packing Company, Appellee).

First District (Industrial Commission Division)   No. 1—88—228WC

Opinion filed November 9, 1988.

Perz, Condon, Ridge & Berke, of Chicago (Daniel F. Capron, of counsel), for appellant.

Terrance J. Van Driska, of Chicago (Mark A. Potter, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner Dale Darling sought workers' compensation benefits for an alleged repetitive accidental injury to his left arm suffered while working for respondent Crane Packing Company. An arbitrator denied benefits after finding petitioner failed to prove he sustained accidental injuries arising out of and in the course of his employment. The Industrial Commission, with one dissenting member, affirmed the arbitrator's findings, and the circuit court of Cook County confirmed that decision. Petitioner appeals, contending that it was against the manifest weight of the evidence to find insufficient proof that any specific accident occurred and to find insufficient proof that a repetitive trauma occurred, and that it was error as a matter of law to demand quantitative evidence of the exact nature of the repetitive work duties.

Petitioner testified that he began working for respondent in June 1983 as a machine operator. In September 1983, petitioner began working exclusively on a degreaser machine. This operation required "[w]orking with both my hands, with my left hand extended above my head with repeated motions of above my head and below throughout the course of the shift." The repeated motions were required to operate the hoist of the machine. During September and November, petitioner noticed that "toward the end of the day I would experience some soreness in my left arm and left hand and left shoulder." He did not seek medical treatment.

On November 17, 1983, at 3:25 p.m., petitioner began his shift and was operating the hoist on the degreaser machine. Petitioner denied telling the supervisor before work that his hand was swollen. At 3:30 p.m., petitioner noticed his left hand had become swollen. He stopped work, reported the problem to his supervisor, Mickey Terrell, and then returned to work. He continued to work for 25 minutes, but the pain increased and the arm became swollen. In addition, the left arm and hand had become discolored, turning dark red. He reported to his supervisor and then left work to seek medical care.

Supervisor Terrell testified that on November 17, 1983, at approximately 3 p.m., before starting the shift, petitioner told Terrell "his hand was swollen and he thought he might not be able to do a particular type of work, his task. I took a look at the hand and it was swollen and I asked him if he could work with it and he said no and that was the conversation." To the best of Terrell's knowledge, petitioner did not work at all that day. Terrell testified that petitioner's job on the degreasing unit required pushing and pulling a hoist. Petitioner told Terrell he was not sure how his hand became swollen, but it could have come from operating the hoist. Petitioner had been a very good worker and had not experienced any other work accidents. Terrell recalled petitioner reporting "a slight accident at home" in early November 1983 when he fell down some stairs. Petitioner lost no time from work following that accident.

When petitioner left work on November 17, 1983, he immediately sought medical treatment. On November 20, he returned to the hospital. A November 20, 1983, emergency room record indicates that petitioner "woke up Thursday" November 17 with a swollen left hand, and the swelling had increased since then, traveling to the left arm.

Petitioner was admitted to the hospital, where he remained for three weeks, and was treated by Dr. Gerald Eisenberg and by Drs. McLaughlin and Katz.

Dr. Eisenberg wrote that the left arm showed hyperesthesia, the left hand was grossly swollen, and that petitioner could not move his fingers without considerable pain. Petitioner was discharged from the hospital with a diagnosis of reflex sympathetic dystrophy.

A December 1983 bone scan and physical findings were compatible with the diagnosis of reflex dystrophy. Petitioner received high dosages of steroids and went into a relatively good remission by the end of December. He was pain-free for several weeks in January. Dr. Eisenberg noted that the pain returned one to two weeks after returning to his job. "[A]ny attempt to resume work resulted in recurrence of symptoms."

A January 20, 1984, hospital progress note states that on the November 1983 admission the etiology was felt to be related to his job, "which involved a repetitive arm motion above his shoulder."

In February 1984, petitioner was again hospitalized by Dr. Eisenberg for surgery and other treatment.

A February 15, 1984, progress note written by Dr. John Wilkum reports: "He had worked in a factory on a hoist using his left arm repetitively and this was thought to be the causative stress leading to his problem."

A February 18, 1984, consultation report by Dr. Sherwyn E. Warren states: "These episodes began about four months ago when the patient's job was changed to one involving reaching overhead and working with his arm overhead."

A February 23, 1984, discharge summary written by Dr. J. Wilkerson stated that petitioner "had worked in a factory on a hoist using his left arm repetitively, and this was thought to be the cause of his stress leading to his problem."

A February 25, 1984, letter from Dr. Melvin P. Katz indicates petitioner reported to the emergency room that the pain and swelling began "while he was doing some work at his job."

In March 1984, petitioner underwent a surgical procedure to resect a cervical rib and a second procedure to resect the first rib. Possible thoracic outlet syndrome was considered possibly important in the pathogenesis of his reflex dystrophy. The surgeon believed this relieved the thoracic outlet's compression of the muscle groups between the two ribs. Petitioner was asymptomatic for two months. In early June 1984, however, the symptoms recurred. A June 19, 1984, examination revealed the left hand was markedly swollen and erythematous. The arm was hyperesthetic, and the range of motion in the shoulder, elbow, wrist and fingers was severely reduced.

On March 13, 1984, Dr. Eisenberg wrote that petitioner developed reflex sympathetic dystrophy in the left upper extremity that was exacerbated by his activities at work. "In his job, he was working a hoist using his left arm repetitively throughout his work day. It was felt that the motion of repetitive elevation and abduction of his left arm may have contributed initially to the development of his problem." It was noted in surgery "that there were fibrous bands between the 2 ribs which were compressing the blood vessels which served the left upper extremity." Dr. Eisenberg opined that petitioner's condition was causally related to his work duties.

In April and May 1984, petitioner remained with his parents in Texas and saw no doctors. In June 1984, he returned to Chicago for further tests. Dr. Eisenberg referred him to Dr. Lawrence Ryan, a rheumatologist. Bone scans, physical therapy and nerve blocks were administered during hospitalization.

A July 20, 1984, letter from Dr. Ryan states that at the "time of onset [of pain and swelling, petitioner] was doing repetitive motions with his shoulder at work." He diagnosed reflex sympathetic dystrophy syndrome with no distinct identifiable underlying neurologic or orthopedic cause. Two treatments with a regional block worsened the pain. Four ganglion blocks improved the hyperesthesia but did not

change the deep pain sensation. A July 23, 1984, discharge summary by Dr. Ryan reports a history dating to November 1983. The patient recounts no obvious trauma to the arm and in his work he apparently made repetitive motions of the left hand and arm.

In August 1984, petitioner moved to Texas. In September, petitioner saw Dr. James Wild, a rheumatologist to whom he was referred by Dr. Eisenberg. Dr. Wild wrote in September that on November 17, 1983, petitioner "first noted swelling in his left hand. This occurred two months after he had been assigned to a new machine at his work, which required that he work much of the time with his hands above the level of his head."

Dr. Wild referred petitioner to Dr. Eugene T. O'Brien, an orthopedic surgeon. On October 22, 1984, petitioner was hospitalized for nine days. He was placed in a body cast and splint and received intensive physical therapy. Dr. O'Brien wrote that on November 17, 1983, "while at work, [petitioner] began to experience pain, swelling and erythema in his left hand in association with the constant use of his left hand over his head in his job, operating a machine." Petitioner testified at arbitration that, except when sleeping, he still wore the sling, left hand glove and brace which Dr. O'Brien prescribed.

In December 1984, Dr. Wild referred petitioner to Dr. Larry Manning, a vascular surgeon. On December 14, 1984, Dr. Manning wrote that in November 1983 the problem first developed. "He had no apparent trauma but states that he made repetitive motions of twisting nature with his left hand and arm while working."

Dr. Manning referred petitioner to Dr. Chester Pruett in January 1985. Dr. Pruett did a series of nerve blocks and referred him to Dr. Edward A. Wolf, a peripheral vascular specialist. Dr. Wolf wrote of the "work which required him to keep his left upper extremity overhead into a twisting rotational type of movement in the course of working with a hoist-type machine. There was repetitive flexing and extension of the forearm muscles involved."

Dr. Wolf found that petitioner developed a left thoracic outlet syndrome after performing a job which required repetitive rotational flexion extension forearm movements with the upper extremity held over his head.

In February 1985, Dr. Pruett admitted petitioner to the hospital and Dr. Wolf performed surgery. He was also treated by a neurologist.

On April 9, 1986, Dr. Pruett wrote that he diagnosed reflex sympathetic dystrophy of the left arm. The "left arm is essentially useless to him and he wears it in a sling. His left arm is totally disabled."

On September 3, 1986, Dr. Marshall I. Matz, a neurosurgeon, ex-

amined petitioner at the request of respondent. Dr. Matz wrote that there was virtually no active use of the left arm. He saw poor muscle tone and two centimeters of atrophy. Wasting of the left hand muscle contour, forearm and upper arm was noted.

On October 1, 1986, Dr. Matz wrote that he reviewed petitioner's medical records. They provided no further insight for him as to "either the etiology of [petitioner's] problem or the causative factors in his current neurologic presentation." He commented, "Prior examining physicians have given varying opinions ranging from thoracic outlet syndrome, cervical ribs, sympathetic dystrophy, varying combinations of the above, coupled with psychiatric diagnoses. All of these statements may have some element of truth." Dr. Matz concluded, "[T]he etiology and the causal connection, if any, between his industrial activities and his current status remains obscure."

An arbitrator denied benefits. The Commission affirmed, finding petitioner failed to prove he sustained accidental injuries arising out of and in the course of his employment on November 17, 1983. The Commission further found that petitioner did not introduce sufficient evidence that he sustained a repetitive trauma arising out of and in the course of his employment. The trial court confirmed that decision.

Petitioner first contends that the Commission's finding that he failed to prove he sustained accidental injuries arising out of and in the course of his employment on November 17, 1983, was against the manifest weight of the evidence. The Commission relied on the November 20, 1983, emergency room report that petitioner stated he woke up November 17 with a swollen left hand. It also pointed to Terrell's testimony that petitioner reported having a swollen hand before his shift began.

█▌█ As a repetitive injury, petitioner need only identify the date on which the injury manifested itself. (*Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, 505 N.E.2d 1026.) Petitioner worked exclusively on the degreaser machine every day for two months, from September 1983 through November 16, 1983. On November 17, he experienced the symptoms of his injury and immediately sought medical treatment. Terrell testified that on that day, petitioner thought the swelling resulted from his work activities. Petitioner consistently reported the same etiology to numerous medical personnel. These factors support a finding that an accident occurred. (See *Peoria County Belwood Nursing Home v. Industrial Comm'n*, 115 Ill. 2d 524, 505 N.E.2d 1026.) Furthermore, there was no evidence that petitioner's condition predated November 17. Petitioner has received considerable medical treatment, including many

hospitalizations, surgeries, examinations and various treatment administered by numerous physicians. Moreover, he has not worked since that date without a recurrence of the severe symptoms. These factors also compel a finding that an accident occurred. (See *General Electric Co. v. Industrial Comm'n* (1984), 129 Ill. App. 3d 352, 472 N.E.2d 486.) Therefore, the November 17, 1983, date was the last day petitioner reported for work when the fact of his injury and its causal connection to his employment became apparent and thus he established a date of an accidental injury. *Peoria County Belwood Nursing Home v. Industrial Comm'n*, 115 Ill. 2d 524, 505 N.E.2d 1026.

The Commission pointed to the discrepancy as to whether petitioner worked for five minutes prior to showing Terrell his swollen arm. Because of the gradual onset of a repetitive injury, the five minutes of work possibly might go to causation, but it has no relevance as to whether or not an "accident" occurred under a repetitive trauma theory. Similarly, the emergency room report's recitation of a history of some swelling before petitioner began work on November 17 is of little relevance to the issue of whether an "accident" occurred that day.

We conclude that the Commission's finding that petitioner failed to prove an accidental injury date of November 17, 1983, was against the manifest weight of the evidence.

■ Petitioner next contends that the Commission's finding that he failed to prove his disablement was causally related to his employment is against the manifest weight of the evidence. Whether an injury arises out of and in the course of employment is generally one of fact for the Commission. However, a reviewing court must set aside the Commission's decision where it is against the manifest weight of the evidence. (*Lewandowski v. Industrial Comm'n* (1969), 44 Ill. 2d 204, 254 N.E.2d 520; *Swanson v. Industrial Comm'n* (1984), 128 Ill. App. 3d 631, 471 N.E.2d 200.) Petitioner must prove that his physical structure gave way under the repetitive stresses of his usual work tasks. (*General Electric Co. v. Industrial Comm'n* (1982), 89 Ill. 2d 432, 433 N.E.2d 671.) An accident arises out of the employment when the injury has its origin in some risk connected with or incident to the employment so that there is a causal connection between the employment and the injury. *Scheffler Greenhouses, Inc. v. Industrial Comm'n* (1977), 66 Ill. 2d 361, 362 N.E.2d 325; *Interlake Steel, Inc. v. Industrial Comm'n* (1985), 130 Ill. App. 3d 269, 474 N.E.2d 402.

In the present case, both the chain of events surrounding the injury and the medical evidence demonstrate strong, uncontradicted proof of a causal connection.

■ A causal connection between work duties and a condition may be established by a chain of events including petitioner's ability to perform the duties before the date of the accident and inability to perform the same duties following that date. (*Pulliam Masonry v. Industrial Comm'n* (1979), 77 Ill. 2d 469, 397 N.E.2d 834.) Here, a causal connection is shown from the events which reveal a prior state of good health; a good work record; a definite accident date; a resulting disability; and petitioner's inability to work, or even to use his left arm or hand at all, after that date. (See *Martin Young Enterprises, Inc. v. Industrial Comm'n* (1972), 51 Ill. 2d 149, 281 N.E.2d 305.) Moreover, Terrell testified that petitioner reported on the date of the accident that he believed the condition was caused by his work duties.

Without exception, the work-related etiology was consistently reported by numerous medical personnel in various hospitals over a period of several years. For example, several treating physicians wrote that the repetitive arm motions and reaching overhead "was thought to be the cause" of the present disability. Dr. Eisenberg wrote that "[i]t was felt that the motion of repetitive elevation and abduction of his left arm may have contributed initially to the development of his problem." He also wrote that the condition was exacerbated by petitioner's activities at work. Another report states that the symptoms "developed as a result of repetitive use of his left arm and left shoulder at work." Dr. Ryan noted that at the "time of onset [petitioner] was doing repetitive motions with his shoulder at work." Dr. O'Brien wrote that the pain and swelling occurred "in association with the constant use of his left hand over his head in his job." Dr. Wolf wrote that the problem developed "after performing a job which required repetitive rotational flexion extension." The weight and significance to be given to these numerous consistent reports cannot be ignored.

Furthermore, a more explicit, and a completely uncontradicted, medical opinion established the requisite causal connection. We note that medical testimony is very important in repetitive trauma cases. *Johnson v. Industrial Comm'n* (1982), 89 Ill. 2d 438, 433 N.E.2d 649, citing *Quaker Oats Co. v. Industrial Comm'n* (1953), 414 Ill. 326, 111 N.E.2d 351; *Perkins Products Co. v. Industrial Comm'n* (1942), 379 Ill. 115, 39 N.E.2d 372. *Cf. Majercin v. Industrial Comm'n* (1988), 167 Ill. App. 3d 894, 522 N.E.2d 263.

Significantly, Dr. Eisenberg, petitioner's treating physician, found a causal connection:

> "While his work obviously did not cause the anatomic abnormalities seen at surgery, it is quite reasonable that the repetitive nature of his activities at work were [*sic*] enough to cause

the anatomic abnormalities to ultimately result in his clinical disease.''

If evidence regarding causation is undisputed, the evidence cannot give rise to permissible conflicting inferences on this issue. (*Material Service Corp., Division of General Dynamics v. Industrial Comm'n* (1973), 53 Ill. 2d 429, 292 N.E.2d 367.) Respondent here failed to rebut the occurrence facts and medical conclusions which indicate the injury was compensable. Respondent's examining physician declined to opine that no causal connection existed. Instead, he could only conclude that "the etiology and the causal connection, if any, between his industrial activities and his current status remain obscure." Thus, the facts supporting causation were uncontradicted. See *Lewandowski v. Industrial Comm'n* (1969), 44 Ill. 2d 204, 254 N.E.2d 520; *Dean v. Industrial Comm'n* (1986), 143 Ill. App. 3d 339, 493 N.E.2d 16.

Respondent points to other possible causes for petitioner's condition, including a November 4, 1983, fall down some stairs and use of arm restraints in the hospital, and a February 1985 accident resulting in some back pain. The record contains no medical evidence indicating either of these apparently minor incidents could possibly result in the disability from which petitioner now suffers. Moreover, it is not necessary that petitioner negate every possible cause of injury. *Bruno v. Industrial Comm'n* (1964), 31 Ill. 2d 447, 202 N.E.2d 13.

We conclude that the record reveals overwhelming evidence that the disabling condition originated in the manner and method in which petitioner was required to do his work and use his left arm in the discharge of his duties. (See *Perkins Products Co. v. Industrial Comm'n,* 379 Ill. 115, 39 N.E.2d 372 (causal connection proved where evidence showed employee required to repeatedly turn and reach back to pick up small boxes, resulting in left wrist disablement).) Clearly, the physical structure gave way under the repetitive stresses of petitioner's usual work tasks. Petitioner established the causal connection between the employment and the injury. The Commission's finding of no causal connection was against the manifest weight of the evidence.

In regard to its finding of no causation, the Commission determined there was insufficient proof that petitioner sustained a repetitive trauma because he failed to prove "the number of times during an hour or during each shift he used his left arm in the operation of the hoist and the effort required in that operation." Similarly, the trial court pointed out that there was "no other testimony as to movement and no evidence as to the weight of the hoist, the frequency of the movements or a description of the exertion needed to push or pull the hoist." The trial court held that such evidence of the "repetitive

nature of the work activity" was necessary as a matter of law.

No evidence here suggests that the weight of the hoist played any role in causing the repetitive trauma. (See, *e.g., Perkins Products Co. v. Industrial Comm'n,* 379 Ill. 115, 39 N.E.2d 372 (repeated turning and reaching for packing displays was key factor in establishing wrist injury; weight not significant where each display weighed only 50 ounces).) To demand proof of "the effort required" or "the exertion needed" to operate the hoist would be meaningless. This case includes no allegation that weight-related factors caused the injury. See, *e.g., Nunn v. Industrial Comm'n* (1987), 157 Ill. App. 3d 470, 510 N.E.2d 502 (back injury; insufficient evidence of weight lifted or pushed, or medical testimony establishing causal connection); *Session v. Industrial Comm'n* (1984), 124 Ill. App. 3d 715, 464 N.E.2d 887 (alleged repetitive injury to arm from repeated heavy lifting not established where no medical evidence of causation, and testimony only referred to a single instance of lifting 31½ pounds).

In addition, the quantitative proof improperly demanded by the Commission typically may carry great weight only where the work duty complained of is a common movement made by the general public, *e.g.,* opening the door of a washing machine. See *Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, 531, 505 N.E.2d 1026, 1029 (Moran, J., concurring) (relies on causation evidence that employee opened door handle of three commercial laundry machines 36 times each day). See also *Nunn v. Industrial Comm'n,* 157 Ill. App. 3d 470, 510 N.E.2d 502 (no causal connection where merely lifting laundry hamper at home caused a recurrence, and could infer claimant engaged in no unusual or strenuous activity prior to onset of pain).

In the present case, however, the evidence clearly demonstrates the unusual nature of the movements required by petitioner's work duties. Significantly, the record also shows that petitioner's work duties required repetitive movements. Petitioner testified that he worked exclusively on the degreaser. He worked with both his hands, "with my left hand extended above my head with repeated motions of above my head and below." As to the number of times, petitioner testified that he performed the operation "throughout the course of the shift." Similarly, petitioner's supervisor testified that petitioner's job on the degreaser required repeated pushing and pulling of the hoist. The medical reports also contain a myriad of statements clearly depicting the repetitive nature and frequency of the movements.

Furthermore, *Peoria County Belwood Nursing Homes* imposes no such quantitative proof requirement. Instead, it emphasizes that

"an employee who alleges injury based on repetitive trauma must still meet the same standard of proof as other claimants alleging an accidental injury. There must be a showing that the injury is work related and not the result of a normal degenerative aging process." (*Peoria County Belwood Nursing Home,* 115 Ill. 2d at 530, 505 N.E.2d at 1028.)

As discussed above, petitioner has clearly made that showing.

Moreover, this type of detailed quantitative proof the Commission found lacking here is not necessarily required in the accidental injury case before us. For example, in *Northern Illinois Gas Co. v. Industrial Comm'n* (1986), 148 Ill. App. 3d 48, 498 N.E.2d 327, the evidence showed that for one hour, decedent shoveled alternate shovelfuls of dirt, which was "very, very hard" because there were a lot of trees, which prevented the rain from soaking into the ground. For 10 minutes, decedent then used a whirly rod to guide pipes underground, which "required decedent to apply pressure by either putting weight on the rod or lifting up on the rod." (*Northern Illinois Gas Co.,* 148 Ill. App. 3d at 50.) This court found the evidence sufficient to show a causal connection without requiring proof of the weight of each shovelful of dirt, the exact number of times decedent lifted the shovel, or the amount of pressure needed to work the whirly rod.

Significantly, this court has recently found, in an occupational disease case involving exposure to chemicals, that it was not necessary to provide specific quantitative evidence of amount, time and duration of exposure, or the dosage of chemicals involved. We refused to expand the requirements for proving a causal connection by demanding more specific proof requirements. (*U.S. Industrial Chemical Co. v. Industrial Comm'n* (1986), 143 Ill. App. 3d 881, 493 N.E.2d 646.) Similarly, no expansion of proof requirements is to be imposed in an accidental injury case such as the present case.

For the foregoing reasons, the judgment of the circuit court of Cook County, confirming the decision of the Industrial Commission, is reversed and the cause is remanded to the Commission for a determination of the compensation to be awarded to petitioner.

Reversed and remanded.

BARRY, P.J., and WOODWARD, McCULLOUGH, and LEWIS, JJ., concur.