NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION, Appellant, v. THE INDUSTRIAL COMMMISSION *et al.* (Jorge C. Diaz, Appellee).

First District (Industrial Commission Division)   No. 1—99—2779WC

Opinion filed June 30, 2000.

McCULLOUGH, P.J., specially concurs.

RAKOWSKI, J., concurring in part and dissenting in part.

James M. O'Brien, of Law Office of James M. O'Brien, of Montgomery, for appellant.

Michael F. Doerries, of Wiedner & McAuliffe, Ltd., of Chicago, for appellee.

JUSTICE HOLDRIDGE delivered the opinion of the court:

Claimant, Jorge Diaz, filed a claim pursuant to the Illinois Work-

ers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 1996)) seeking compensation for a lower back injury sustained on August 14, 1990, while employed by Navistar International Transportation Corporation (the employer). The arbitrator found that claimant sustained accidental injuries that arose out of and in the course of his employment and that were causally connected to his August 14, 1990, accident. The arbitrator further made findings with respect to disputed financial issues of earnings and credit due to the employer under section 8(j) of the Act. The arbitrator awarded claimant temporary total disability (TTD) benefits for three work absences. The first compensated absence was from August 27, 1990, to October 9, 1990. The second was from July 6, 1992, to January 15, 1993, and the third was from November 28, 1994, to June 7, 1995. The latter two absences occurred after claimant underwent lower back surgery. The arbitrator also awarded claimant permanent partial disability (PPD) benefits for a 35% partial disability of the person for claimant's back condition. The Illinois Industrial Commission (the Commission) affirmed the arbitrator's award with one modification: the Commission limited medical expense reimbursement to only those expenses incurred by claimant prior to January 4, 1991. The circuit court of Cook County confirmed the Commission's decision.

Claimant, 59 years old at the time of the accident, had been employed by Navistar for 22 years prior to August 14, 1990. On that date, while claimant was performing his duties as a painter at employer's Melrose Park engine plant, he sustained injury to his low back. Claimant was using a crowbar to release an engine that was stuck on a conveyor belt in the paint booth when the injury occurred. Claimant continued to work the remainder of his shift but reported the accident to his foreman about an hour after the accident when he developed a pain in his low back. The pain radiated from his low back to his legs. Claimant sought no medical treatment on the day of the accident. The following day, claimant appeared at work but, due to continued pain, saw the employer's company nurse and received Ibuprofen. Claimant continued to have back pain radiating to his lower extremities. Claimant sought no further medical attention for his injury until August 27, 1990, when he saw his chiropractor, Dr. Minnis, who took X rays, prescribed physical therapy, ultrasound, manipulation, and ice pack therapy. Dr. Minnis opined that claimant's injury was a result of claimant's work-related accident. Dr. Minnis also advised claimant to stop working for two weeks after finding that claimant had some limitation of motion. At claimant's request, Dr. Minnis discharged claimant to the company doctor on August 30, 1990.

The company physician referred claimant to Dr. Akkeron, an orthopedic surgeon. On August 30, 1990, Dr. Akkeron examined claimant and determined that the motion of claimant's lumbar spine was limited but that claimant had full range of motion of both hips and found no evidence of muscle atrophy or weakness. X rays showed degenerative disc disease and arthritic changes in the lumbar spine. Dr. Akkeron prescribed a lumbar spine MRI, which was performed by Dr. Liebman on September 2, 1990. Dr. Liebman determined that the MRI showed no evidence of disc herniation or intradural abnormalities but that it did show degenerative disease at L5-S1, minimal bulging at L2-L3 and L3-L4, with spinal stenosis at L4-L5 and possibly at L3-L4. Based on Dr. Liebman's MRI report and his own review of the MRI, in his September 21, 1990, report, Dr. Akkeron stated that he did not believe that the changes on the MRI were due to the claimant's accident of August 14, 1990, and that there was no evidence of a ruptured disc. Dr. Akkeron prescribed physical therapy, ultrasound, electrical stimulation, intermittent traction and that claimant remain off work. Claimant attended the physical therapy sessions from September 11 to October 10, 1990, but continued to complain of back pain, problems sleeping due to the pain, numbness, and pain in both thighs.

Admitted into evidence were both still photographs and a surveillance videotape of claimant during the weekend of October 5-6, 1990, which showed claimant performing cement step masonry activities. Claimant cut and replaced three to four pieces of ceramic tile on the front stoop of his home over the course of a half-hour. The following week, claimant was examined by employer's physician and, on October 10, 1990, claimant returned to work without restriction to full duty as a painter. Claimant saw Dr. Akkeron on October 11, 1990, who concurred with claimant's return to work. Dr. Akkeron again noted in his records that the MRI did not show any ruptured disc and that the only problem with claimant's lower back was a degenerative arthritic problem. Claimant continued to work full-time, prying engines off the conveyor three to four times per shift. Claimant continued to suffer from low back pain.

On October 30, 1990, about three weeks after he returned to full duty, claimant sought a second opinion from orthopedic surgeon Dr. Lorenz, who was referred by Dr. Akkeron. Dr. Lorenz found that claimant's range of motion was mildly restricted with some discomfort at the extremes of motion and diagnosed claimant's injuries as degenerative changes in his lower back. Dr. Lorenz suggested anti-inflammatories. Claimant also saw Dr. Morganstern on November 12, 1990, and he also diagnosed claimant as suffering from degenerative

disease of the lumbar spine and prescribed Feldene for relief of symptoms. He suggested back exercises and concluded that claimant could continue to perform his job.

On January 4, 1991, claimant saw his family physician, Dr. Kim, and told him that his back pain was worsening and that he was having difficulty sleeping. Dr. Kim examined claimant and found that he was suffering from a back spasm and lower back tenderness and had a straight leg raising test that was positive at less than 75 degrees on his left side. Dr. Kim prescribed an MRI, which was performed by Dr. Diamond on January 10, 1991. Dr. Diamond diagnosed severe spinal stenosis at the L4-L5 disc, bulging and stenosis at the L3-L4 level, and central herniation of the L4-L5 disc. Claimant continued to work in his position as a painter with employer and continued to have low back and leg pain. On referral from Dr. Kim, claimant saw Dr. Acuna on June 17, 1992. On intake paperwork, claimant answered "no" when asked if the injury was work related. Claimant later told the arbitrator that his condition was work related, but that he had been confused by the question.

Dr. Acuna hospitalized claimant on July 7, 1992, and performed a decompressive laminectomy from L3 to S1 and surgically excised the herniated L4-L5 disc. Dr. Acuna testified that the herniation of the L4-L5 disc was not reflected on Dr. Liebman's MRI report because at the time of the first MRI, September 2, 1990, the herniated disc did not exist. Dr. Acuna testified that the decompressive portion of the surgery was a result of claimant's spinal stenosis resulting from the degenerative disc disease. He opined that the work accident aggravated the preexisting condition, causing pain, which required surgical correction. Dr. Acuna released claimant to work on January 13, 1993, and claimant returned to his full duties on January 17, 1993, where he continued to experience lower back and leg pain and cramping.

In May of 1993, claimant was examined by Dr. Coe, who was of the opinion that claimant's injury caused his lower back condition. Dr. Coe opined that the injury necessitated the surgeries after aggravating claimant's preexisting back condition. In June of 1993, further examinations and a new MRI demonstrated some new disc bulging. Claimant continued to work in his full-time position, taking medication for his pain and receiving an injection to his lumbar region on November 11, 1993. At employer's request Dr. E. Thomas Marquardt examined claimant on August 26, 1993. Dr. Marquardt testified that "those degenerative changes and spinal stenosis which were found on that [September 2, 1990,] scan were preexistent degenerative conditions which had existed in the lumbar spine for some period of time." Dr. Marquardt based his opinion on the fact that the disc herniation

was not present in the scan done three to four weeks after claimant's injury but that the herniation appeared later. He testified that the disc herniation occurred between the September 2, 1990, MRI scan and the January 14, 1991, MRI scan. Dr. Marquardt, however, did agree that the accident could aggravate the preexisting condition, cause pain, and therefore necessitate surgery. He also agreed that claimant's work activities from October 10, 1990, through July 6, 1992, could cause a bulging disc to progress to a herniation.

Dr. Acuna saw claimant again in April of 1994 and told him that he had degenerative disk disease and arthritis that would never completely be resolved. Claimant saw Dr. Acuna again in October of 1994, and at that time Dr. Acuna referred claimant to Dr. Harrison, a neurosurgeon. In November of 1994, Dr. Harrison prescribed a lumbar myelogram and CT scan, which revealed stenosis at L3-L4 and L4-L5. Claimant underwent a second surgery on November 26, 1994, in an attempt to create sufficient room for nerve structures to prevent compression. Dr. Harrison testified that he may have removed both scar tissue and disc tissue but believed that if he did remove disc tissue, it must have developed after the September 2, 1990, MRI (where no disc material was noted) but before the January 10, 1991, MRI (where the disc was noted as present). Dr. Harrison also testified that the compression he operated to relieve was not present during the first surgery. Dr. Harrison opined that a causal relationship existed between claimant's condition and his accident at work. He believed that claimant had a preexisting condition which, prior to the accident, was asymptomatic. Dr. Harrison also attributed the recurrence of claimant's symptoms to his return to his previous employment activities, which ultimately resulted in the need for the second surgery.

Claimant returned to work in June of 1995 in his full-time position as a painter, although, thanks to advances in technology, his job was less manual and more automated. Claimant continues to experience pain in his lower back and legs and takes over-the-counter medication to relieve his pain. Claimant received group disability benefits for both surgical absences; July 6, 1992, to January 15, 1993, and November 28, 1994, to June 7, 1995. Employer paid claimant a gross amount of $21,439 in benefits and, after taxes, claimant netted $14,873.67. The arbitrator credited employer for the $14,873.67 under section 8(j).

■ Employer first argues that claimant failed to meet the burden of causation in order to recover under the Act. A claimant bears the burden of proof to establish the elements of his right to compensation. *Nabisco Brands, Inc. v. Industrial Comm'n*, 266 Ill. App. 3d 1103, 1106 (1994); *Board of Trustees of the University of Illinois v. Industrial*

*Comm'n,* 44 Ill. 2d 207, 214 (1969). In order for accidental injuries to be compensable under the Act, a claimant must show such injuries arose out of and in the course of his or her employment. *Nabisco,* 266 Ill. App. 3d at 1106; *Caterpillar Tractor Co. v. Industrial Comm'n,* 129 Ill. 2d 52, 57 (1989); *Hammel v. Industrial Comm'n,* 253 Ill. App. 3d 900, 902 (1993). For an injury to arise out of one's employment, it must have an origin in some risk connected with or incidental to the employment so that there is a causal connection between the employment and the injury. *Nabisco,* 266 Ill. App. 3d at 1106; *Lubin Management Co. v. Industrial Comm'n,* 200 Ill. App. 3d 432, 435 (1990).

■ It is within the province of the Commission to determine the factual issues, to decide the weight to be given to the evidence and reasonable inferences to be drawn therefrom, and to assess the credibility of witnesses. *Old Ben Coal Co. v. Industrial Comm'n,* 261 Ill. App. 3d 812, 814 (1994); *Mendota Township High School v. Industrial Comm'n,* 243 Ill. App. 3d 834, 836 (1993). The Commission's determination of these issues will not be set aside unless it is against the manifest weight of the evidence. *Marathon Oil Co. v. Industrial Comm'n,* 203 Ill. App. 3d 809, 815-16 (1990). A determination as to a causal connection is a question of fact to be decided by the Commission, which will not be disturbed unless it is against the manifest weight of the evidence, that is to say, unless the opposite conclusion is clearly apparent. *Antonopoulos v. Industrial Comm'n,* 195 Ill. App. 3d 689, 693, (1990).

Employer asks this court to reverse the Commission's award of TTD and PPD benefits to claimant arguing that the Commission's finding of causation is against the manifest weight of the evidence. Employer contends that the Commission erred in determining that claimant's lower back condition was caused by the work-related accident of August 14, 1990. Employer asserts that claimant, aged 59 at the time of the accident, had a preexisting degenerative disc disease in his lumbar region. Employer points out that claimant took only Ibuprofen for the first two weeks after his accident and did not seek medical attention until August 27, 1990. In support of its position that claimant's preexisting condition, and not any work-related accident, caused the need for his surgery, employer cites the opinions of several physicians who examined and treated claimant.

First, both Dr. Liebman and Dr. Akkeron found no evidence of disc herniation in claimant's first MRI but rather only evidence of degenerative disc disease preexisting claimant's accident. Second, both Dr. Akkeron and employer's company doctor returned claimant back to full-time work with no duty restrictions around October 10, 1990. Third, Dr. Lorenz found that claimant had only a mildly restricted

range of motion and diagnosed him with degenerative changes only. Fourth, Dr. Morganstern diagnosed claimant with osteoarthritic degenerative disease of the spine and lumbar region and prescribed medication for relief of pain symptoms. The opinions and diagnoses of these expert physicians, employer contends, lead to the conclusion that claimant had a lower back problem as a result of degenerative disease and that the minor accident on August 14, 1990, only caused temporary aggravation of this preexisting lumbar degenerative disc disease but did not result in the necessity for surgery or claimant's ongoing ill-health.

Employer proposes that some other injury, known only to claimant, caused the "worsening" condition of claimant's back. It primarily supports this contention by noting that there was no disc herniation on September 10, 1990, three weeks after the accident, but there was disc herniation by January 10, 1991. Employer argues that at some point between the two MRI scans, claimant injured his back in an "outside work" incident. Employer further argues that it is clear that claimant's back problems were not caused by his August 14, 1990, accident because: first, claimant said that his injury was not related to work; second, claimant had his employee health insurance billed for his treatment; and third, claimant failed to give any history at the time he was treated by Dr. Acuna that an accident at work brought about his back pain. For all of the above-mentioned reasons, employer argues that it is clear that claimant failed to prove causation and therefore the Commission's decision is against the manifest weight of the evidence.

Claimant conversely argues that the Commission's finding of causation between the accident and his injury is not against the manifest weight of the evidence. Claimant contends that causation may be proven by a chain of events, including evidence of an employee's good health followed by a decreased ability to perform the requirements his job. Claimant, like employer, also cites the medical opinions of the treating physicians to establish that the Commission's finding that the claimant's work injury was the cause of claimant's condition of ill-being was not against the manifest weight of the evidence.

First, both Dr. Minnis and Dr. Akkerson noted that claimant's injury was consistent with the accident and found no complaints relatable to any non-work-related incident. Second, Dr. Acuna testified that moving a 1400-pound engine with a crowbar could cause symptoms to arise from a preexisting condition, thus necessitating future surgery to relieve the pain. Third, Dr. Harrison agreed that the work accident aggravated the preexisting condition, noting that symptoms began af-

ter the injury and recurred again upon claimant's return to work after surgery. Fourth, Dr. Coe opined that the accident caused claimant's injury, which resulted in the two surgeries, and also noted that claimant suffered from no symptoms of his condition until after the August 14, 1990, accident. Finally, Dr. Marquardt testified that the accident may have caused the eventual need for the surgery. Claimant asserts that, based on the opinions of these physicians, the Commission drew all reasonable and permissible inferences in determining that the work accident evoked pain in claimant's preexisting back condition, eventually necessitating surgery for pain relief.

Claimant further argues that claimant's condition of good health prior to the accident and nearly constant state of ill-health after the accident allow for an inference on causation. Claimant points out that he never injured his back, sought treatment for back injury, or missed work for any back injury prior to August 14, 1990, the date of the accident. Additionally, after the August injury, claimant has suffered from lower back and leg pain nearly constantly and has spent five years undergoing medical treatment, including two surgeries. Claimant also notes that the circuit court found that claimant testified consistently during the many medical histories he provided to treating and examining physicians. Claimant contends that there is no evidence that he suffered from any type of non-work-related injury but, rather, that the work-related injury alone caused claimant's disability. For these reasons, Claimant urges this court to find that the decision of the Commission is not against the manifest weight of the evidence.

■ Proof of prior good health and change immediately following and continuing after an injury may establish that an impaired condition was due to the injury. *Spector Freight System, Inc. v. Industrial Comm'n*, 93 Ill. 2d 507 (1983). See *Darling v. Industrial Comm'n*, 176 Ill. App. 3d 186, 193 (1988) ("A causal connection between work duties and a condition may be established by a chain of events including petitioner's ability to perform the duties before the date of the accident and inability to perform the same duties following that date"). Here, the claimant went from a state that allowed him to work before August 14, 1990, to a state of disability after that date. Even if claimant had asymptomatic back problems prior to August 14, 1990, there is testimony that it may have been the work accident that caused the pain to begin. The opinions of many of claimant's treating and examining physicians support the argument that there is causation between claimant's poor health and the work accident of August 14, 1990.

Dr. Acuna and Dr. Harrison both testified that the work injury could have caused the claimant's low back pain by rendering a preexisting condition symptomatic so as to eventually necessitate

surgery. Dr. Marquardt also agreed that the work accident could aggravate claimant's preexisting condition, cause pain, and therefore necessitate surgery. He also agreed that claimant's work activities from October 10, 1990, through July 6, 1992, could cause a bulging disc to progress to a herniation. Dr. Coe testified that a causal connection exists between claimant's condition of ill-being and his work injury. Dr. Mitchell testified that, although he did not see disc herniation on the September 2, 1990, MRI, surgery is the "gold standard" to determine if disc herniation existed. Dr. Acuna, who performed the surgery, testified that disc herniation did exist. It is within the province of the Commission to judge the credibility of witnesses, to draw reasonable inferences from their testimony, and to determine the weight accorded thereto. *Price v. Industrial Comm'n*, 278 Ill. App. 3d 848, 852 (1996). The Commission's findings on these questions will not be disturbed on review unless they are contrary to the manifest weight of the evidence. In light of the physical demands of claimant's job, his excellent work record prior to the accident, his poor health following the accident, and the testimony of the many examining physicians, the finding of the Commission as to causation cannot be said to be against the manifest weight of the evidence.

■ Employer further argues that it should have been credited for the gross amount of benefits paid to claimant, not the net amount of compensation claimant received. Employer incurred losses in a gross amount of $21,439 in disbursement of group disability benefits for claimant's two post-surgical absences. Claimant received from employer $14,873.67 in group disability benefits. The $6,565.33 difference between the amount employer paid and the amount claimant received is the state and federal taxes that employer is required to withhold and forward to the state and federal government. The parties stipulated to the amounts paid by employer and the amounts received by claimant. There is no dispute that employer is entitled to credit under section 8(j) of the Act. Section 8(j), in pertinent part, states:

"(j) 1. In the event the injured employee receives benefits, including medical, surgical or hospital benefits under any group plan covering non-occupational disabilities contributed to wholly or partially by the employer, which benefits should not have been payable if any rights of recovery existed under this Act, then such amounts so paid to the employee from any such group plan as shall be consistent with, and limited to, the provisions of paragraph 2 hereof, shall be credited to or against any compensation payment for temporary total incapacity for work or any medical, surgical or hospital benefits made or to be made under this Act." 820 ILCS 305/8(j)(1) (West 1992).

There is no question that credits under section 8(j) of the Act are "to or against any compensation payment for temporary total incapacity." 820 ILCS 305/8(j)(1) (West 1992).

Employer argues that it should receive credit for the gross amount paid, $21,439, rather than the net amount, $14,873.67, actually received by claimant. Employer argues that the purpose of the Act is to compensate a claimant for "lost wages" only. Employer asserts that "lost wages" should only include the amount that employee would net; total payment minus taxes. Employer contends that if it is only allowed credit for the net amount claimant actually received under the group health plan, claimant is receiving a windfall or double recovery because claimant still has all withheld tax credit accounts in the full amount of the taxes paid by employer. Moreover, employer points out that the order says: "Respondent shall have credit for *all amounts paid*, if any, *to or on behalf of petitioner* on account of said accidental injury" (emphasis added). Employer argues that this should allow it credit for the entire amount, partially paid to claimant and partially paid in taxes on behalf of claimant. Claimant conversely argues that the credit provided to employer, $14,873.67, is consistent with the provisions of the Act and follows the intent of the legislature. Claimant asserts that the plain language of the statue allows credit for amounts *paid to the employee*. The intent, claimant contends, is to allow a claimant to receive benefits up to his TTD rate.

This appears to be an issue of first impression in Illinois, as our research has not revealed any case law directly addressing this question. Statutory interpretation is a question of law. *Spear v. Board of Education of North Shore School District No. 112*, 291 Ill. App. 3d 117, 119 (1997). The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *In re Marriage of Logston*, 103 Ill. 2d 266, 277 (1984). The best way of doing so, and thus the first step in construing a statute, is to examine the language of the statute. *Logston*, 103 Ill. 2d at 277. If the language is clear, the court must give it effect without looking to extrinsic aids. *Logston*, 103 Ill. 2d at 277. In examining statutory construction, we must give effect to the language and intent of the legislature. *People v. Hicks*, 164 Ill. 2d 218, 222 (1995). The most reliable indicator of intent is the statute's language, which should be given its plain and ordinary meaning. *In re Estate of Rennick*, 181 Ill. 2d 395 (1998). In considering legislative intent, courts must "presume that the legislature did not intend absurdity, inconvenience or injustice, and select an interpretation of the statute which leads to logical results and avoids that which would be absurd." *People v. Liberman*, 228 Ill. App. 3d 639, 647 (1992). In the instant case, the plain language of the statute at issue allows

credit for "amounts so paid to the employee." 820 ILCS 305/8(j) (West 1992). Following the plain language of the statute, an employer should not be entitled to a credit for amounts not paid to the employee, including amounts paid to the government in withheld taxes. In this case, the amount paid to claimant/employee under the employer's group health plan was $14,873.67. This is the amount that the employer was credited by the Commission. The decision of the Commission cannot be said to be contrary to law.

Because the decision of the Commission is not against the manifest weight of the evidence nor contrary to law, the decision of the Commission is affirmed.

Affirmed.

COLWELL and RARICK, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, specially concurring:

I concur in the opinion and write separately only as to the section 8(j) credit. I believe the tax consequences of the payments are important in determining the amount of credit due under section 8(j). Workers' compensation payments are exempt from tax. Some health benefit plan payments are not. The tax consequences to the claimant are not provided in this record. I believe there is a failure of proof as to the monetary benefit to the claimant.

JUSTICE RAKOWSKI, specially concurring in part and dissenting in part:

The majority has determined that the employer's credit under section 8(j)(1) is limited to the net amount of disability benefits after taxes are withheld rather than the gross amount of benefits before taxes are withheld. For the following reasons, I respectfully submit that this determination is contrary to logic, the unambiguous language of section 8(j)(1), and the Internal Revenue Code (26 U.S.C. § 105 (1994)). Additionally, the majority fails to cite authority for such a determination while ignoring contrary holdings from North Carolina and New York.

The language of section 8(j)(1) is clear:

"In the event the injured employee receives benefits, including medical, surgical or hospital benefits under any group plan covering non-occupational disabilities contributed to wholly or partially by the employer, which benefits should not have been payable if any rights of recovery existed under this Act, then such amounts so *paid* to the employee from any such group plan as shall be consis-

tent with, and limited to, the provisions of paragraph 2 hereof, shall be credited to or against any compensation payment for temporary total incapacity for work or any medical, surgical or hospital benefits made or to be made under this Act." (Emphasis added.) 820 ILCS 305/8(j)(1) (West 1998).

In the instant case, the employer paid claimant $21,439 in group disability benefits. Because those disability benefits are taxed by federal and state governments (see 26 U.S.C. § 105 (1994); 35 ILCS 5/701(b) (West 1998)), and because "every employer making payment of wages shall deduct and withhold upon such wages a tax determined in accordance with tables or computational procedures" (26 U.S.C. § 3402(a)(1) (1994); see 35 ILCS 5/701(a) (West 1998)), employer was obligated to withhold $6,565.33 from claimant. It is clear employer withheld and remitted this amount to federal and state governments on behalf of claimant to satisfy claimant's potential tax obligation, which is not only determined by his income from employer, but is also determined by a myriad of other factors, including other income, itemized deductions, and the number of claimant's dependants.

The majority claims that the $21,439 in disability benefits, however, was not actually "paid" to claimant. This view is overly simplistic. It is axiomatic that there could not be withholding taxes set aside based on the $21,439 in benefits unless claimant was actually "paid" that amount.

Although claimant contends that he will not receive the full benefit of his workers' compensation award if the gross amount of his disability benefits is credited to employer, such a view is clearly erroneous. Again, section 8(j)(1) states in part: "In the event the injured employee receives benefits *** under any group plan covering non-occupational disabilities contributed to *** by the employer, *which benefits should not have been payable if any rights of recovery existed under this Act*, then such amounts so *paid* *** shall be credited to or against any [workers'] compensation [award] ***." (Emphasis added.) 820 ILCS 305/8(j)(1) (West 1998). This language effectively transforms disability benefits paid under a group plan covering nonoccupational disabilities into workers' compensation benefits when an award has been made. It also has the legal effect of transforming the amounts paid as disability benefits from taxable income to nontaxable workers' compensation benefits. See 26 U.S.C. § 104(a)(1) (1994) (taxable gross income does not include "amounts received under work[ers'] compensation acts"). Thus, as a consequence of the legal effects of section 8(j)(1), there remain amounts withheld from claimant's income which should not have been withheld as taxes and remitted to federal and state governments. A claimant, however, can easily remedy this

situation by filing an Internal Revenue Service form (currently the 1040X) and the pertinent state income tax form that request a refund due to an overpayment of taxes. The refund of withholding taxes will then place the claimant in the same position he would have been in if he had been receiving workers' compensation benefits from the outset.

Claimant receives the same amount in workers' compensation benefits under the majority approach or my approach. The majority approach, however, is flawed in that it fails to give the employer its full section 8(j)(1) entitlement for disability benefits paid to claimant while it gives federal and state governments taxes to which they are not entitled. In this case, the majority approach gives employer only $14,873.67 in credit against the workers' compensation award instead of the $21,439 to which it is entitled. The $6,565.33 difference remains with federal and state governments. The fatal flaw is that federal and state governments are not entitled to this or any amount because the operation of section 8(j)(1) transformed taxable disability benefits into nontaxable workers' compensation benefits. The net effect then is that employer will have paid $6,565.33 more toward compensating claimant for his injuries.

Under my approach, employer receives its full $21,439 credit for disability benefits that were paid to claimant. Claimant is then entitled to recoup $6,565.33 he paid in taxes on the disability benefits since those benefits were retroactively transformed into nontaxable workers' compensation benefits. Thus, under my approach, both employer and claimant receive the amounts to which they are entitled. Federal and state governments do not, however, receive money to which they are not entitled. It is without question that, in enacting section 8(j)(1), the legislature could not have intended the result reached by the majority wherein monies due the employer (the intended beneficiary of section 8(j)(1)) are given to federal and state governments which are not entitled to the tax. The very purpose of section 8(j)(1) is defeated. Two other jurisdictions that have reviewed substantially similar provisions and issues have reached the same conclusion.

In *Evans v. AT&T Technologies, Inc.*, 332 N.C. 78, 418 S.E.2d 503 (1992), the second of two issues was whether the amount of employer's credit toward workers' compensation benefits is in the amount of the gross before-tax amount paid by employer's "Sickness and Accident Disability Plan" to the claimant or is in the amount of the net after-tax amount received by the claimant. In concluding that the credit should be the gross before-tax amount paid by employer's disability plan, the court observed that disability benefits are taxed, that workers' compensation benefits are not, and that claimant was entitled to the withholding taxes on the disability benefits after the disability

benefits were transformed into workers' compensation benefits following an award of compensation. *Evans*, 332 N.C. at 88-89, 418 S.E.2d at 510. The court further observed:

> "In addition, if employers were allowed a deduction equal to the net after-tax amount [of disability benefits] ultimately received by the employee, administration of this part of our Workers' Compensation Act would be almost impossible for the Industrial Commission. The withholding of taxes by the employer is based on an estimate of the employee's ultimate tax liability; an employee's tax liability is not established until the employee files a tax return for the particular tax year. The actual tax liability may vary depending on numerous factors, such as the amount of any itemized deductions, the number of the taxpayer's dependents, and the amount of any other income. If the credit given employers should be held to be equal to the net after-tax amount ultimately retained by the employee, the Industrial Commission would be required to calculate the tax liability of each recipient in order to credit the employer with the proper after-tax amount. Allowing a credit equal to the amount of gross before-tax payments made to the employee avoids these complexities and facilitates the efficient administration of the Act." *Evans*, 332 N.S. at 89-90, 418 S.E.2d at 510.

The New York case of *Graham v. Lipe Rollway Corp.*, 114 A.D.2d 570, 494 N.Y.S.2d 431 (1985), also provides guidance, although it deals with FICA withholdings and not income tax withholdings. There, the claimant argued the same simplistic reasoning processes employed by the majority in the instant case—that, since FICA taxes were withheld from him when he was receiving disability benefits, those amounts so withheld were not actually paid to him. As such, claimant contended that the workers' compensation provisions did not authorize reimbursement of the amount withheld. The court rejected claimant's argument, asserting:

> "The FICA taxes withheld from the payments to claimant were remitted to the Federal government on behalf of claimant and satisfied an obligation owed by claimant. The employer, of course, also paid its own share of FICA taxes. Accordingly, the Board could rationally conclude that the full amount of the award was effectively paid to claimant within the meaning [of the] Workers' Compensation [Act] ***.

> *** The effect of the retroactive award of workers' compensation benefits, which are not subject to FICA taxes, together with the nonduplication of benefits provision of [the Act], is to render the FICA taxes withheld from claimant's disability award overpayments which are refundable." *Graham*, 114 A.D.2d at 570-71, 494 N.Y.S.2d at 432.

I find the reasoning of *Evans* and *Graham* to be on point and supportive of my approach. Moreover, it appears to me that the majority's approach belies public policy. In essence, the majority's approach penalizes employers that provide disability benefits to its employees by denying employers a full credit for disability benefits that were paid to an injured employee before a workers' compensation award was rendered.

Thus, considering the unambiguous language of section 8(j)(1), the fact a claimant can seek reimbursement of the taxes that were withheld from the disability benefits after an award of workers' compensation retroactively includes those benefits, and the case law that supports my view, I conclude that section 8(j)(1) requires a credit in favor of employer for the gross, before-tax amount in disability benefits.

I concur in all other aspects of the majority decision.