GEORGE ANTONOPOULOS, Appellant, v. THE INDUSTRIAL COMMIS-SION *et al.* (Morse/Diesel of Illinois, Inc., Appellee).

First District (Industrial Commission Division)   No. 1—89—1190WC

Opinion filed March 16, 1990.

Ritsos & Ritsos, of Chicago, for appellant.

Wiedner & McAuliffe, Ltd., of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, George Antonopoulos, sought worker's compensation benefits for an injury allegedly suffered while working for respondent, Morse/Diesel of Illinois, Inc. An arbitrator awarded no benefits. The Industrial Commission affirmed that decision, which in turn was confirmed by the circuit court of Cook County. Petitioner appeals, contending that the Commission's finding that he failed to prove a causal connection between his accidental injuries and his condition of ill-being is against the manifest weight of the evidence.

At the arbitration hearing, petitioner testified through an interpreter that on May 7, 1979, he was 51 years old and had worked as a laborer for respondent for seven years. At 10:30 a.m. that day, while dismantling a wooden construction ladder at Michael Reese Hospital in Chicago, petitioner was struck on the left side of the head by a two-by-four board with two nails protruding from it. When he fell, he "was out." After Roger Winter, a co-employee, washed off the blood, he took petitioner to the hospital emergency room.

At the emergency room, petitioner was seen by a doctor at 5:30 p.m. The doctor simply instructed him to return if the skin punctures swelled. He left the hospital at 8 p.m. and took the bus home.

The May 7, 1979, hospital emergency room record describes the nature of the complaints. A board with nails fell on the left side of petitioner's face. He complained of problems seeing and pain when he opened his mouth. There were two small puncture wounds next to his

left ear. The report states: "He suffered no loss of consciousness." The discharge diagnosis was "2 nail wounds on face," and he was instructed to keep the area clean, and return if the skin became red, swollen or tender.

Petitioner worked the next two days, and then saw his family physician, Dr. Elias Stambolis. At work, petitioner noticed he had trouble standing. The foreman changed his job duties. He then worked until February 1, 1980, except for several months of layoff. He took aspirin for pain and headaches during that period. In February, he entered the hospital. He has not worked since that time. He had never experienced dizziness or hearing problems prior to the accident.

At the December 1984 arbitration hearing, petitioner testified that he continued to suffer from dizzy spells and problems on the left side of his head. He sees Dr. Stambolis every few weeks. Dr. Stambolis also treats him for high blood pressure, which he was not treated for prior to the accident.

On cross-examination, petitioner testified that in February 1980, he might have given the hospital a history of dizziness for two months. He did not tell the hospital he had been treated for a left ear infection since November 1979.

Roger Winter testified for petitioner that on May 7, 1979, he was working with petitioner and witnessed the accident. "He fell to his knees" and was unconscious for four or five minutes. Winters helped clean up some blood from the left side of his face, then took him to the emergency room and left. As he left, it seemed like petitioner "was in a daze."

Dr. Elias Stambolis testified for petitioner at a 1985 evidence deposition. While his residency training was in obstetrics, he now had a general practice. On May 10, 1979, he examined petitioner and found "some infected wound around the ear, posterior." He continued to treat petitioner and saw him about 100 times from that time until October 1984. In May 1979, petitioner had a normal blood pressure and had complaints of dizziness, headaches and earaches. Dr. Stambolis opined there was a causal connection between those complaints and the injury "[b]ecause before he had no complaints. In the beginning I thought it was nothing, just infection." But the symptoms persisted, and he concluded that "the injury caused his complaints." The diagnosis was cerebral concussion and trauma. The condition was permanent.

In February 1980, Dr. Stambolis began treating petitioner for high blood pressure. He also hospitalized petitioner for tests regard-

ing the dizziness. Dr. Stambolis acknowledged the hospital records reported a history of only a few months of dizziness, beginning in November 1979. In regard to having treated petitioner for a left ear infection for only three months, Dr. Stambolis denied knowing of that. Dr. Stambolis was not aware petitioner suffered from a bilateral hearing problem. Dr. Stambolis relied on Dr. Hart's opinion that the hearing problems resulted from the injury at work.

Dr. Cecil Hart testified for petitioner at an evidence deposition on October 3, 1984. He first saw petitioner on February 29, 1980. Initially, there was a balance problem and some hearing loss on the left side. A December 16, 1980, note by Dr. Hart states that petitioner was injured at work when he "was struck over the left ear, knocked out, and taken to the hospital. His diagnosis at this time is one of a brain and labyrinthine concussion." The prognosis was poor.

On May 7, 1981, Dr. Hart examined petitioner and found a significant change in his hearing. On July 17, 1981, he performed exploratory surgery of the left ear. He cleaned away some scar tissue, and petitioner's hearing improved. A February 1983 hearing test showed the hearing in the left ear to be better than it had been prior to surgery, but not as good as in the right ear. Dr. Hart testified that he then changed his opinion regarding causation and now concluded that the work accident did not cause petitioner's condition of ill-being. He believed that the problems were due to infectious disease rather than the injury. Dr. Hart had noted that the original report of petitioner's injury showed that the two nails did not enter the ear canal, but struck petitioner on the outside of the ear.

Dr. Hart's opinion on causation would differ if there had been a loss of consciousness. In regard to the dizziness, a blow to the head could cause a concussion of the inner balance organ or the balance centers in the brain. The dizziness, however, could also be from petitioner's significant depression, high blood pressure or atrophy of the brain. He pointed to the fact that initially there had been no hearing loss, and the fact that the loss of balance was on both sides, not just the left side.

Respondent offered several reports of Dr. M. Reese Guttman, an otolaryngologist. On October 5, 1982, Dr. Guttman examined petitioner, who stated that he was "unconscious for one-half hour" following the accident. Dr. Guttman diagnosed a total loss of vestibular function, bilateral. The condition was not the result of the minor trauma described and was unrelated to petitioner's employment. He based his opinion on the absence of certain clinical findings he would expect to find in such a case. He noted there was no history of loss of

consciousness mentioned in the emergency room report. Moreover, the nail wounds did not enter the ear, and there was no blood found in the ear canal. In addition, the hearing problems did not begin for almost a year. The hospital records also showed that in February 1980, petitioner had been treated for dizziness and ear infections for only a few months, and not since the May 1979 accident. The surgery report indicated findings which were characteristic of a long-continuing infectious process. High blood pressure and cervical arthritis could also have caused the dizziness.

In an October 5, 1984 evidence deposition, Dr. Guttman offered opinions similar to those in his reports. He also testified that his opinion on causation would remain the same if he were told petitioner had been unconscious for a half hour after the accident.

The arbitrator found that petitioner failed to prove a causal relationship between the accidental injuries and his condition of ill-being. The Commission agreed, relying on Dr. Hart's opinion that the left hearing loss was most likely caused by scar tissue from an ear infection rather than the blow to his ear. It pointed to Dr. Hart's belief that the dizziness could be related to high blood pressure, depression, brain atrophy or a loss of balance function in the inner ear on both sides. The Commission also relied on Dr. Guttman's opinion that the hearing loss and dizziness were unrelated to trauma, based on his conclusions that the audiometric curves and acoustic reflexes showed a hearing loss consistent with persons in his age group; the absence of middle ear pathology until one year after the accident; and on medical evidence that the dizziness was caused by marked hypertension.

Petitioner maintains that the Commission's finding of no causal connection is against the manifest weight of the evidence. The question of causal connection is one within the unique province of the Industrial Commission, and we will not disturb its finding unless it is contrary to the manifest weight of the evidence. (*Certi-Serve, Inc. v. Industrial Comm'n* (1984), 101 Ill. 2d 236, 461 N.E.2d 954; *Cook v. Industrial Comm'n* (1988), 176 Ill. App. 3d 545, 531 N.E.2d 379.) It is the function of the Commission to resolve conflicting testimony, including medical testimony, and draw inferences from the evidence. Its determinations will not be set aside if there is credible evidence in the record to support them. (*Lyons v. Industrial Comm'n* (1983), 96 Ill. 2d 198, 449 N.E.2d 1323.) Moreover, in the presence of conflicting medical opinions, the Commission's determination is given substantial deference. (*Material Service Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 382, 454 N.E.2d 655.) It is for the Commission to decide which of two conflicting medical opinions given in a case is to be accepted.

*Caterpillar Tractor Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 35, 454 N.E.2d 252; *Health & Hospitals Governing Comm'n v. Industrial Comm'n* (1979), 75 Ill. 2d 159, 387 N.E.2d 676.

■ In the present case, conflicting medical opinions were presented to the Commission as to whether there was a causal relationship between the work-related incident and petitioner's condition of ill-being. There was ample, credible medical evidence adduced in the record to support the Commission's determination that there was no causal relationship. In reaching that result, the Commission as trier of fact was entitled to rely on the opinions of Drs. Guttman and Hart, and to reject the opinion offered by Dr. Stambolis.

As we have noted, Dr. Guttman offered strong medical foundation for his belief that petitioner's state of ill-being was the result of a continuing, unresolved infectious process that started in November 1979, seven months after the May 1979 accident. Dr. Guttman also stated that petitioner's condition was neither caused nor aggravated by the work incident. Likewise, Dr. Hart, although he originally thought otherwise, believed there was no causal connection after seeing the emergency room report showing the two nails did not enter the ear canal, and when he performed surgery and saw indications that the hearing problems had been the result of infectious disease. Dr. Hart concluded that it would be difficult to ascribe the hearing loss to the accident. Both doctors also stated that petitioner's condition could have been caused by significant depression, high blood pressure or atrophy of the brain.

Petitioner, however, points to the factual issue of whether he lost consciousness. We note that petitioner mentioned it only on cross-examination. He told Dr. Guttman he had been unconscious for a half hour. Winter, however, recalled it was "like he was out for maybe four or five minutes."

Most significantly, the emergency room report states: "No loss of consciousness." Moreover, nothing in the report indicates that after an observation of petitioner, the medical personnel were concerned about a possible concussion. The discharge diagnosis referred only to "2 nail wounds on face." The instructions given him concerned only the cleaning of the two wounds and watching for infection in that area. There were no instructions regarding dizziness, loss of hearing, or loss of consciousness.

Furthermore, Dr. Guttman did not believe there had been a loss of consciousness, despite petitioner's testimony to the contrary. If a patient came into the hospital reporting a blow to the head, he most certainly would be asked whether he was unconscious. If he was, that

fact definitely would be recorded, and the patient would have been treated much differently than petitioner was treated. A patient reporting a half-hour period of unconsciousness would be admitted to the hospital and given extensive neurological tests. Dr. Guttman also stated that his opinion on causation would remain the same even if petitioner had been unconscious.

Petitioner points to Dr. Hart's testimony that his opinion that no causal connection existed would differ if there had been a loss of consciousness. Dr. Hart testified that he would expect a patient who suffered a hearing loss to have had "a history of a concussion *or* loss of consciousness to cause something of that magnitude." (Emphasis added.) However, in the medical records he saw no indication of concussion; no indication of loss of consciousness; a loss of balance function on *both* sides, not just the left side; and surgical findings indicating an infection had been present for some time. Thus, it appears Dr. Hart would need more than a belief that loss of consciousness occurred in order to drastically alter his opinion on causation.

The Commission, therefore, was entitled to find no causal connection had been proved, whether or not it believed petitioner had lost consciousness at some point.

Petitioner also argues that his language problems prevented him from offering an accurate report of the unconscious period to the emergency room staff. While there are several cursory references to the language problems in the medical records, we believe the exact nature and extent to any language problem would have to be left to the arbitrator and Commission.

We conclude that it was within the province of the Commission to determine whether petitioner proved causal connection and to resolve the conflicting medical testimony. We will not disturb the Commission's findings because they are strongly supported by credible evidence in the record. Its decision is not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County confirming the decision of the Industrial Commission is affirmed.

Judgment affirmed.

BARRY, P.J., and WOODWARD, McCULLOUGH and LEWIS, JJ., concur.