PERVIS DANIELS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Archibald Candy Corporation, Appellee).

First District (Industrial Commission Division)   No. 1—98—4573WC

Opinion filed June 19, 2000.—Rehearing denied August 29, 2000.

582

HOLDRIDGE, J., dissenting, joined by RARICK, J.

Ann-Louise Kleper, of Lewis, Davidson & Hetherington, Ltd., of Chicago, for appellant.

Edward A. Coghlan, of Nyan, Pfister, Bambrick & Kinzie, P.C., of Chicago, for appellees.

JUSTICE COLWELL delivered the opinion of the court:

Claimant, Pervis Daniels, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1992)), alleging that while in the employ of respondent, Archibald Candy Company, he injured his back while lifting a kiln. An arbitrator awarded claimant $593.11 per week in temporary total disability (TTD) benefits for a period of $57^6/_7$ weeks (see 820 ILCS 305/8(b) (West 1992)), $7,828.25 in medical expenses (see 820 ILCS 305/8(a) (West 1992)), and additional compensation pursuant to sections 16, 19(k), and 19(l) of the Act (see 820 ILCS 305/16, 19(k), 19(l) (West 1992)). On review, the Industrial Commission (Commission) determined that claimant was entitled to TTD benefits for a period of only $14^5/_7$ weeks. The Commission also vacated the awards of additional compensation and medical expenses. The circuit court of Cook County confirmed.

On appeal, claimant contends the Commission's decision is void because the panel that rendered it was illegally constituted. Alternatively, claimant argues that the Commission's findings as to causal connection, TTD benefits, medical expenses and additional compensation are against the manifest weight of the evidence. We affirm.

## I. FACTS

The following summary of facts is taken from the record on appeal. Claimant worked for respondent, a candy manufacturer, for 27 years. Prior to the accident at issue, claimant sustained a work-related injury in 1981, when he fell off a ladder. As a result of the fall, claimant sustained a herniated disc at the L4-L5 level, for which he underwent surgery in January 1982. This surgery was performed by Dr. James Dupre. Dr. Dupre continued to treat claimant for ap-

proximately seven months. Following the surgery, claimant ceased working for about one year. Claimant testified that from the time he returned to work after the surgery until June 23, 1994, he continued to have problems with his back. Most notably, every few months claimant's back would stiffen up for a period of several days. However, claimant did not miss any work due to these problems.

The accident at issue occurred on June 23, 1994. At that time, claimant worked as a supervisor-cook. Claimant's duties included running a "sand vac" machine. According to claimant, the "sand vac" machine consists of a large conveyor belt. Candy emerges from the "sand vac" machine on the belt and is deposited into a large kiln that sits on a scale. When the scale registers between 220 and 222 pounds, it is lifted onto a horse by two employees. Claimant stated that he felt a "pop" in the lower part of his back while helping lift a kiln. Following the accident, claimant experienced pain in his lower back and he could barely move. Medical personnel employed by respondent advised claimant to take aspirin for the pain.

Claimant continued working for a week after the accident. However, he noticed that his back was not improving. On June 30, 1994, defendant saw Dr. Eduardo Israel at Rush-Presbyterian-St. Luke's Occupational Health Center (Rush). Dr. Israel diagnosed claimant with back strain and gave him medication and a back brace. Dr. Israel also referred claimant to physical therapy. Claimant was returned to restricted work duties. However, no such work was available at that time.

On July 6, 1994, claimant saw Dr. Leonard Smith, an orthopedic surgeon at Rush. Dr. Smith advised claimant to remain off work and to continue physical therapy. Dr. Smith also recommended an MRI. The MRI showed postdiscectomy changes at L4-L5 with moderate to severe bilateral neuroforaminal stenosis, mild bilateral neuroforaminal stenosis at L2-L3 and L3-L4 with congenital narrowing of the spinal canal to the entire lumbar region.

Dr. Smith examined claimant next on August 15, 1994. At that time, claimant was complaining of pain and burning involving his leg. After reviewing claimant's X rays, Dr. Smith opined that there was no adequate explanation for this pain. Dr. Smith also concluded that the MRI findings were not consistent with the June 23, 1994, date of injury. Dr. Smith ordered an EMG of claimant's back and leg to determine the physiologic status of the nerves. He also started claimant on a temporary program of TENs unit and pelvic traction. The EMG study did not show any abnormalities. However, the neurologist that performed the EMG noted that the exam was difficult because of claimant's inability to relax.

On September 7, 1994, Dr. Smith prescribed epidural blocks for claimant. During this treatment, claimant remained off work and continued to receive physical therapy. Dr. Smith noted that, during the course of this treatment, claimant's condition was gradually improving. On October 7, 1994, Dr. Smith found that claimant had substantially improved and was able to resume regular work activities.

Claimant returned to work on October 10, 1994. However, claimant testified that he was still experiencing pain in the lower part of his back. On October 18, 1994, claimant was examined by Dr. Chang Sun Kim, a physician with Treister Orthopaedic Services, Ltd. Dr. Kim prescribed medication and physical therapy. Dr. Kim also recommended that claimant refrain from working.

Dr. Michael Roy Treister examined claimant on November 10, 1994. According to Dr. Treister, X rays showed a fusion at L3-L4 and L4-L5 in the interbody area between the vertebral bodies. The X rays also revealed that the disc space at L5-S1 was intact. However, Dr. Treister noted that, while there were not many secondary changes in L5-S1, the canal looked very tiny on lateral films. Dr. Treister opined that claimant had what appeared to be an acute disc herniation at the L5-S1 level on the right, which was probably related to lifting the kiln on June 23, 1994.

Dr. Treister prescribed a lumbar myelogram and postmyelogram CT scan, which claimant underwent on November 30, 1994. According to Dr. Treister, the postmyelogram CT scan showed significant and severe lumbar spinal canal stenosis, particularly at the L4-L5 level but also at the L5-S1 level. Moreover, there was considerable hypertrophy of the posterior elements at L5-S1. Claimant continued to complain of pain and Dr. Treister recommended surgical decompression of the lower two lumbar levels. However, this surgical procedure was never performed.

Based on this history, Dr. Treister opined that claimant's condition of ill-being was caused in part by the accident that occurred on June 23, 1994. Dr. Treister acknowledged that claimant suffered from a spinal canal stenosis long before the June 23, 1994, accident. However, Dr. Treister attributed the spinal canal stenosis to three causes: (1) claimant's 1981 work-related accident; (2) degenerative disc disease; and (3) a congenitally small spinal canal. It was Dr. Treister's opinion that claimant's June 23, 1994, accident aggravated a preexisting condition.

On March 8, 1995, Dr. Smith reexamined claimant. In his notes pertaining to that visit, Dr. Smith noted claimant's prior history of back injury. Dr. Smith also concluded that claimant's symptoms, which included evidence of a congenitally narrow spinal canal with postdisc-

ectomy changes of epidural scarring, neural foraminal occlusion and spinal stenosis, were not related to the June 23, 1994, accident. Dr. Smith recommended a work-hardening program and opined that claimant would be able to return to a medium-work-level program with restriction for heavy lifting. Dr. Smith did not believe that surgery would significantly help claimant. Moreover, Dr. Smith commented that any surgery would be for a condition not causally connected to the June 23, 1994, incident.

At the time of the arbitration hearing, claimant testified that he suffered from incontinence and had trouble walking even short distances. In addition, claimant stated that he could not perform any household chores and he could drive only short distances.

The arbitrator rendered her decision on October 25, 1995. The arbitrator determined that claimant's present condition of ill-being was causally related to his injury. In so concluding, the arbitrator deemed Dr. Smith's opinion "virtually worthless" because it provided no elaboration. Relying on medical records and the testimony of claimant and Dr. Treister, the arbitrator awarded claimant TTD benefits of $593.11 per week for a period of 57$6/7$ weeks and medical expenses of $7,828.25.

The arbitrator also found that, while it was undisputed that claimant was unable to work from June 30, 1994, through October 9, 1994, a period of 14$4/7$ weeks, respondent paid claimant for only 12 weeks. Moreover, despite Dr. Treister's notes and letters that claimant was unable to work after October 19, 1994, respondent did not compensate claimant. Thus, the arbitrator concluded that claimant was entitled to $2,500 in penalties under section 19(l) of the Act. The arbitrator also determined that respondent unreasonably or vexatiously delayed payment of compensation to claimant, entitling him to penalties of $13,599.05 under section 19(k) of the Act. Finally, the arbitrator found that respondent had unreasonably and vexatiously delayed payment of benefits due claimant, entitling him to attorney fees of $10,225.08 pursuant to section 16 of the Act.

The Commission issued its decision on June 12, 1997. The Commission modified the arbitrator's decision, finding that claimant was entitled to TTD benefits for only 14$5/7$ weeks. The Commission based its decision on the fact that claimant had a prior fusion of the L3-L4 and L4-L5 level in 1982. The Commission relied on Dr. Smith's records and his opinion that claimant was able to return to work on October 7, 1994. Since the panel determined that termination of the TTD benefit payments by respondent on October 7, 1994, was not unreasonable, it vacated the additional compensation awarded pursuant to sections 16, 19(k), and 19(l) of the Act. Finally, the Commission

vacated the award of medical expenses because they represented expenses for treatment incurred after October 7, 1994. On administrative review, the circuit court of Cook County confirmed the Commission's decision.

## II. ANALYSIS

### A. Composition of the Commission

Claimant first contends that the Commission's decision is void because the panel that considered and decided this case was illegally constituted.

### 1. Section 13 of the Act

■ Section 13 of the Act (820 ILCS 305/13 (West 1992)) governs the composition of the Commission. It provides that the Commission is to consist of seven members to be appointed by the Governor, by and with the consent of the Senate. Of those seven, two are to be representative citizens of the employing class operating under the Act (management members), two are to be representative citizens of the class of employees operating under the Act (labor members), and three are to be representative citizens not identified with either the employing or employee class (public members). Moreover, no more than four members of the Commission shall be of the same political party and one of the three public members must be designated by the Governor as chairman. Section 13 further provides:

> "Notwithstanding any other provision of this Act, in the event the Chairman shall make a finding that a member is or will be unavailable to fulfill the responsibilities of his or her office, the Chairman shall advise the Governor and the member in writing and shall designate a certified arbitrator to serve as acting Commissioner. The certified arbitrator shall act as a Commissioner until the member resumes the duties of his or her office or until a new member is appointed by the Governor, by and with the consent of the Senate, if a vacancy occurs in the office of the Commissioner, but in no event shall a certified arbitrator serve in the capacity of Commissioner for more than 6 months from the date of appointment by the Chairman." 820 ILCS 305/13 (West 1992).

### 2. Claimant's Panel

Claimant's case was heard and decided by the Commission's panel "B." According to both parties, at the beginning of 1996, when claimant's case was assigned, panel "B" consisted of the following three members: (1) John W. Hallock, Jr., (2) Barry Ketter, and (3) Linzey Jones.

However, on June 17, 1996, Commissioner Hallock was appointed

as acting chairman. He became chairman on July 16, 1996. As a result, arbitrator Kathleen Hagan was designated acting commissioner and served from June 17, 1996, until December 16, 1996. Following the expiration of Hagan's six-month term, arbitrator David Kane was designated to serve as acting commissioner from December 17, 1996, until June 17, 1997.

Commissioner Jones received a medical leave of absence in August 1996, and he resigned from his post on October 21, 1996. In his stead, arbitrator Calvin Tensor was appointed as acting commissioner from September 1, 1996, until February 28, 1997. Subsequently, arbitrator Joseph Reichart served as acting commissioner from March 1, 1997, until August 31, 1997.

Thus, the panel that heard and decided this case was composed of Commissioners Ketter, Kane, and Reichart.

### 3. Discussion

Claimant argues that the panel that decided this matter was illegally constituted. Specifically, defendant complains that pursuant to section 13 of the Act: (1) the chairman may only fill a seat vacated by a commissioner in those cases where the vacancy is temporary in nature; and (2) the chairman may not appoint successive acting commissioners after the first appointed acting commissioner's six-month term has expired. In this case, claimant argues that both Hallock's appointment as chairman and Jones' resignation as commissioner resulted in permanent vacancies on the Commission requiring the Governor to appoint new commissioners to replace them. In addition, claimant notes that successive acting commissioners heard and decided his case. Because of these alleged deficiencies, claimant contends that the Commission's decision is void. We disagree.

Statutory construction is a question of law. *King v. Industrial Comm'n*, 301 Ill. App. 3d 958, 962 (1998). The primary rule of statutory interpretation is to ascertain and give effect to the intention of the legislature. *Divittorio v. Industrial Comm'n*, 299 Ill. App. 3d 662, 669 (1998). The best evidence of the legislature's intent is the clear and unambiguous language of the statute. *King*, 301 Ill. App. 3d at 962, citing *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). The court must also read the statute as a whole and consider all its parts together. *Polsky v. BDO Seidman*, 293 Ill. App. 3d 414, 424 (1997). A court may not alter the plain meaning of a statute by reading into it any limitations that do not exist. *People v. Cochran*, 167 Ill. App. 3d 830, 832 (1988). Where the statutory language is clear and unambiguous, it is given effect without resort to other aids of construction. *King*, 301 Ill. App. 3d at 962. With these principles in mind, we discuss claimant's arguments.

### a. *Permanent Vacancies*

■ We first address whether the chairman is entitled to appoint an acting commissioner only when there is a temporary absence on the Commission. As indicated earlier in this disposition, the first sentence of the paragraph of section 13 at issue allows the chairman to designate a certified arbitrator to serve as acting commissioner when the chairman makes a finding that a member of the Commission is "unavailable to fulfill the responsibilities of his or her office." This language does not qualify or limit the situations in which the chairman may designate an acting commissioner. See *Cochran*, 167 Ill. App. 3d at 862. Thus, the plain language of the statute dictates that the chairman may designate an acting commissioner in the case of a temporary absence or a permanent vacancy.

Moreover, when we read the second sentence of the paragraph of section 13 that is in dispute, the impropriety of claimant's position becomes apparent. That sentence provides that a certified arbitrator designated by the chairman "shall act as a Commissioner until the member resumes the duties of his or her office *or* until a new member is appointed by the Governor, by and with the consent of the Senate." (Emphasis added.) 820 ILCS 305/13 (West 1992). In employing disjunctive language, it is clear that the legislature contemplated allowing the chairman to designate an acting commissioner when either a temporary or a permanent vacancy occurs. Had the legislature intended this provision to apply only in situations in which the absence was temporary, it would not have included language pertaining to the Governor's duty to appoint replacement members to the Commission.

Nevertheless, claimant insists that only the Governor may fill permanent vacancies on the Commission. Claimant points to another paragraph in section 13 which provides, "[i]n the case of a vacancy in the office of a Commissioner during the recess of the Senate, the Governor shall make a temporary appointment until the next meeting of the Senate, when he shall nominate some person to fill such office." 820 ILCS 305/13 (West 1992). Claimant contends that allowing the chairman to fill permanent vacancies would render the aforementioned language superfluous. Once again, we must disagree.

We have already determined that, pursuant to the plain language of section 13, it is the chairman of the Commission that fills both temporary absences and permanent vacancies. However, as discussed, the chairman's selection of a certified arbitrator to fill a vacancy on the Commission only lasts until (a) the unavailable member resumes the duties of his or her office or (b) the Governor appoints a replacement member by and with the advice of the Senate. The portion of section 13 of the Act cited by claimant dictates the procedure to be

employed when the Governor wishes to appoint a commissioner and the Senate is not in session. In that case, the Governor makes a temporary appointment until the next meeting of the Senate. When the Senate reconvenes, the Governor must then make another nomination, upon which the Senate votes. We find nothing in the provision cited by claimant that would prohibit the chairman from designating acting commissioners in the case of a permanent vacancy on the Commission.

### b. *Successive Six-Month Terms*

■ Claimant also contends that the chairman may only appoint one certified arbitrator as acting commissioner to one six-month term. According to claimant, once this initial six-month appointment expires, the seat remains vacant until the Governor acts to fill the seat. Claimant notes that the language of the statute provides, *"The* certified arbitrator shall act as a Commissioner until the member resumes the duties of his or her office or until a new member is appointed by the Governor ***, but in no event shall *a* certified arbitrator serve in the capacity of Commissioner for more than 6 months from the date of appointment by the Chairman."* (Emphasis added.) 820 ILCS 305/13 (West 1992). According to claimant, the legislature's use of the definite article "the" at the beginning of this passage and its later use of the indefinite article "a" in referring to "certified arbitrator" evinces the legislature's intent to limit the chairman to a single six-month appointment. Claimant argues that, had the legislature intended otherwise, it would have consistently used "the" before "certified arbitrator" in the aforementioned passage.

We find claimant's position without merit. A plain reading of the passage cited by claimant reveals that the term "a certified arbitrator" refers back to "the certified arbitrator" designated by the chairman and mentioned earlier in the passage. Moreover, a plain reading of this provision reveals that there is but one limitation on the chairman's power to designate acting commissioners. That is, acting commissioners may only serve for a maximum six-month term. Absent from the language of the statute is any limiting language that would prohibit the chairman from appointing successive acting commissioners to successive six-month terms.

### c. *Acting Commissioner's Affiliation & Appointment of State Officers by Governor*

Before we turn to the merit's of claimant's case, we must address two additional issues.

■ At oral argument, claimant suggests that appointment of an acting commissioner could upset the political and/or labor-management

balance of the Commission. Claimant relies on the following language in support of her position:

> "The designation of a certified arbitrator to act as a Commissioner shall be considered representative of citizens not identified with either the employing or employee classes and the arbitrator shall serve regardless of his or her political affiliation." 820 ILCS 305/13 (West 1992).

Although we share claimant's concern, we are powerless to act. The plain language of the Act provides that a certified arbitrator designated as an acting commissioner shall serve regardless of his or her political affiliation and will be identified as a public member. Only the legislature can alter this provision.

■ In addition, we are aware a provision in the Illinois Constitution of 1970 addresses the duty of the Governor to appoint certain state officers. That provision provides in pertinent part:

> "The Governor shall nominate and, by and with the advice and consent of the Senate, a majority of the members elected concurring by record vote, shall appoint all officers *whose election or appointment is not otherwise provided for*." (Emphasis added.) Ill. Const. 1970, art. V, § 9(a).

We do not find this section applicable to our analysis of section 13 of the Act.

In *People v. Evans*, 247 Ill. 547 (1910), our supreme court analyzed parallel language contained in the 1870 Constitution (Ill. Const. 1870, art. V, § 10) and held that the "whose appointment or election is not otherwise provided for" language was plain and unambiguous. *Evans*, 247 Ill. at 556. The court stated:

> "It was clearly the intention of the framers of this constitutional provision that the appointing power, in cases of all offices established by the constitution or created by law, should be vested in the Governor, *unless the appointment or election to such offices is otherwise provided for by the constitution or by statutory enactment*." (Emphasis added.) *Evans*, 247 Ill. at 556.

In this case, the legislature provided for an alternate method of appointment in section 13 of the Act. Therefore, we decline to hold that the appointment of acting commissioners must be done in conformity with article V, section 9(a), of the Illinois Constitution of 1970.

## B. Manifest Weight of the Evidence

### 1. Causal Connection and TTD Benefits

We now turn to claimant's argument that the Commission's finding that his condition of ill-being after October 7, 1994, was not caus-

ally connected to the June 23, 1994, accident, is against the manifest weight of the evidence. Claimant asserts that this result is compelled by the fact that respondent offered no evidence that claimant was able to work after October 18, 1994. Claimant also relies on Dr. Smith's March 1995 medical report, which, according to claimant, did not pronounce him fit to return to work.

The Commission's decision regarding causal connection will not be set aside on review unless it is contrary to the manifest weight of the evidence. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984). In order for a finding to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Elmhurst-Chicago Stone Co. v. Industrial Comm'n*, 269 Ill. App. 3d 902, 906 (1995). In other words, the reviewing court will assess whether there was sufficient factual evidence in the record to support the decision. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450 (1982).

Moreover, it is the function of the Commission to resolve disputed questions of fact, to decide which of conflicting medical views is to be accepted, and to draw permissible inferences. *Old Ben Coal Co. v. Industrial Comm'n*, 217 Ill. App. 3d 70, 83 (1991). Interpretation of the testimony of medical witnesses is particularly within the province of the Commission. *A.O. Smith Corp. v. Industrial Comm'n*, 51 Ill. 2d 533, 536-37 (1972). It is for the Commission to decide which of two conflicting medical opinions in a given case is to be accepted. *Antonopoulos v. Industrial Comm'n*, 195 Ill. App. 3d 689, 693 (1990). The fact that other inferences could be drawn from the evidence does not require us to reject permissible inference drawn by the Commission. *Steiner v. Industrial Comm'n*, 101 Ill. 2d 257, 260-61 (1984).

█ In this case, the Commission was presented with conflicting medical evidence whether claimant's post October 7, 1994, condition of ill-being was causally connected to the June 23, 1994, accident.

The medical evidence showed that as early as August 15, 1994, Dr. Smith questioned whether claimant's symptoms were consistent with the alleged date of injury, June 23, 1994. At that time, Dr. Smith noted that, while claimant continued to complain of pain and burning involving his leg, X rays did not explain claimant's condition. Moreover, the results of claimant's MRI were not consistent with the date of injury of June 23, 1994, and the results of claimant's EMG were normal.

Dr. Smith released claimant to work on October 7, 1994. He next saw claimant on March 8, 1995. At that time, Dr. Smith noted that claimant has a prior history of back injury with resulting surgery to the lumbar spine and development of a spinal fusion, in addition to which there is evidence of a congenitally narrow spinal canal with postdiscectomy changes of epidural scarring, neural foraminal occlu-

sion and spinal stenosis, all of which are unrelated to the June 23, 1994, accident. Dr. Smith also opined that surgery was not warranted and, in any case, if performed, it would be for a condition not causally connected to the incident in question. Because claimant had become deconditioned, Dr. Smith recommended a work-hardening program. He opined that, following completion of the work-hardening program, claimant would be able to return to work at a medium level.

While Dr. Treister believed that claimant's condition of ill-being was caused in part by the June 23, 1994, accident, he acknowledged that claimant suffered from preexisting spinal canal stenosis long before the June 23, 1994, accident. Dr. Treister attributed the preexisting spinal canal stenosis in part to claimant's 1981 work-related accident, in part to degenerative disc disease, and in part to a congenitally small spinal canal. Thus, it was Dr. Treister's opinion that claimant's June 23, 1994, accident aggravated a preexisting condition.

We conclude that the finding of the Commission that claimant did not establish a causal connection between the post October 7, 1994, condition of ill-being and the June 23, 1994, accident was not against the manifest weight of the evidence. The Commission had before it the opinions and records of both Drs. Smith and Treister. It opted to rely on the opinion and records of Dr. Smith. Moreover, we note that Dr. Treister acknowledged that claimant suffered from long-term back problems and he explained that claimant's 1981 work-related injury and surgery, as well as degenerative disc disease and claimant's congenitally small spinal canal, caused claimant's stenosis.

In passing, we note that the only reason that Dr. Smith's March 10, 1995, report does not recommend claimant's immediate return to work is because he found claimant "deconditioned" ostensibly because he had been away from work for almost a year. In addition, we note that despite claimant's contention to the contrary, Dr. Smith originally released to work on October 7, 1994, eleven days prior to October 18, 1994.

As a natural consequence of our finding, we also conclude that the Commission's decision to terminate claimant's TTD benefits as of October 7, 1994, was not against the manifest weight of the evidence.

## 2. Medical Expenses

■ Next, claimant contends that the Commission's finding that he is not entitled to medical expenses in the amount of $7,828.25 is against the manifest weight of the evidence. All of these medical expenses were incurred after Dr. Smith's October 7, 1994, finding that claimant was able to return to work. Given our affirmance of the Commission's conclusion that claimant's condition of ill-being after

October 7, 1994, was not causally connected to the June 23, 1994, accident, we also conclude that the Commission's finding that claimant was not entitled to medical expenses for this period is not against the manifest weight of the evidence.

### 3. Additional Compensation

Claimant also challenges the Commission's decision to vacate the arbitrator's award of additional compensation pursuant to sections 16 and 19(k) of the Act. Section 16 permits the Commission to assess attorney fees against an employer when the employer unreasonably fails to pay all compensation due the employee. Section 19(k) permits the Commission to award additional compensation to the employee in cases in which there has been unreasonable or vexatious delay of payment or underpayment. The intent of these sections is to implement the Act's purpose to expedite the compensation of industrially injured workers and penalize an employer who unreasonably, or in bad faith, delays or withholds compensation due an employee. *McMahan v. Industrial Comm'n*, 289 Ill. App. 3d 1090, 1093 (1997), *aff'd as modified*, 183 Ill. 2d 499 (1998).

The employer bears the burden of justifying the delay in paying compensation due under the Act. *McMahan*, 289 Ill. App. 3d at 1093. Where the evidence suggests that the employer could have reasonably believed that the employee was not entitled to the withheld compensation, penalties under sections 16, 19(k), and 19(l) will not be assessed. *Connell v. Industrial Comm'n*, 170 Ill. App. 3d 49, 56 (1988). Whether the employer's conduct and reliance on medical opinion is reasonable under the circumstances is a question of fact for the Commission to decide. *Archer Daniels Midland Co. v. Industrial Comm'n*, 174 Ill. App. 3d 918, 923 (1988), *aff'd in part & rev'd in part*, 138 Ill. 2d 107 (1990).

■ In this case, the record shows that the medical evidence supported a conclusion that claimant's condition had improved and that he was able to return to work as of October 7, 1994. It was therefore reasonable for the respondent to conclude that claimant was no longer entitled to TTD benefits after that date.

Nevertheless, claimant contends that pursuant to section 7110.70(a) of the Commission's rules (50 Ill. Adm. Code § 7110.70(a) (1991)), respondent was required to inform him, in writing, within 14 days of the reason for denial of TTD benefits. According to claimant, respondent failed to inform him in writing that it was denying TTD benefits after October 7, 1994.

An employer's failure to inform the employee in writing before the last TTD payment of its reason for terminating the payments is a fac-

tor to consider in awarding penalties. 50 Ill. Adm. Code §§ 7710.70(a), (e) (1991); *Connell*, 170 Ill. App. 3d at 56. Here, respondent paid claimant TTD benefits from the date he was injured until he was released by Dr. Smith to return to work on October 7, 1994. Further, claimant was provided written notification of the basis of respondent's denial of TTD benefits after October 7, 1994, by Dr. Smith's release. See *Connell*, 170 Ill. App. 3d at 56 (finding improper assessment of penalties after date on which claimant became aware that doctor had released him to perform work). Thus, we reject claimant's argument.

Finally, claimant maintains that he is entitled to additional compensation pursuant to section 19(l) of the Act because respondent failed to pay him for 2⁴/₇ weeks of compensation. Section 19(l) permits the award of additional compensation in cases in which the employer withholds or refuses to pay weekly TTD benefits. The Commission reversed the arbitrator's award of section 19(l) penalties. On administrative review, the trial court noted that claimant did not raise this issue before the arbitrator. Rather, the arbitrator, *sua sponte*, addressed this issue in her decision. A review of the record confirms the trial court's finding. Moreover, the trial court noted that implicit in the Commission's decision to deny additional compensation was that neither party was aware of any shortage of compensation and that respondent did not act intentionally or in bad faith. We agree.

Therefore, we affirm the trial court's decision confirming the denial of additional compensation pursuant to sections 16, 19(k), and 19(l) of the Act.

### III. CONCLUSION

For the aforementioned reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, J., concur.

JUSTICE HOLDRIDGE, dissenting:

I respectfully dissent. The decision of the Industrial Commission in this matter is void, as the panel that rendered the decision was illegally constituted.

The plain language of section 13 of the Act vests the *responsibility* for appointing members of the Industrial Commission in the Governor ("There is created an Industrial Commission consisting of 7 members *to be appointed by the Governor*, by and with the consent of the Senate ***." (Emphasis added.) 820 ILCS 305/13 (West 1992). The Act also

plainly provides that when a vacancy occurrs in the Commission, it will be *promptly* filled by the Governor, for it expressly provides that "[i]n case of a *vacancy* in the office of a Commissioner during the recess of the Senate, the Governor *shall* make a temporary appointment until the next meeting of the Senate, when he shall nominate some person to fill such office." (Emphasis added.) 820 ILCS 305/13 (West 1992).

The relevant provisions of the Act quoted above lead directly to two inescapable conclusions: (1) only the Governor, upon the advice of the Senate, can fill a *vacancy* in the Commission; and (2) once a *vacancy* in the Commission occurs it should be *immediately* filled by the Governor, even if only on a temporary basis until such time as the Senate can act on confirmation.

The majority posits, however, that this clear mandate upon the Governor to act quickly in filling *vacancies* on the Commission is somehow modified by the provision that allows the Chairman of the Commission to "make a finding that a *member* is or will be unavailable to fulfill the responsibilities of his or her *office*, [and to] \*\*\* designate certified arbitrator to serve as acting Commissioner." (Emphasis added.) 820 ILCS 305/13 (West 1992).

I disagree. The provision that allows the chairman to appoint an arbitrator where a member is unavailable presupposes that the person being temporarily replaced is still a *member* of the Commission. Here, Commissioner Hallock ceased being a member of the Commission on June 17, 1996, when he was appointed chairman by the Governor, and Commissioner Jones ceased being a member of the Commission on October 21, 1996, the effective date of his resignation. Thus, Governor James Edgar was *mandated* to fill those positions *immediately*, even if by means of a temporary "recess appointment." The Act's provision of a means by which an incapacitated Commission member could be temporarily replaced did not provide a means by which Governor Edgar could abdicate his responsibility.

I cannot agree with the majority's conclusion that the statutory limitations on the length of the term the certified arbitrator serves as acting commissioner, or the use of the indefinite article in describing the arbitrator serving in that capacity, negated the legal responsibility of Governor Edgar to act promptly in filling a vacancy on the Commission.

It inescapably appears that Governor James Edgar refused to exercise his legal responsibility to promptly appoint commissioners in order to circumvent the requirements of the Act with regard to the representation of labor and management classes and political affiliation. In view of the clear statutory language regarding prompt ap-

596

pointment of members of the Commission, I would find that the Commission that ruled on claimant's petition was illegally constituted. This deliberate violation of the Act should not be allowed to go unchecked.

JUSTICE RARICK joins this dissent.