FILED

November 6, 2019
Carla Bender
4th District Appellate

2019 IL App (4th) 180626WC-U

Workers' Compensation
Commission Division
Order Filed: November 6, 2016

No. 4-18-0626WC

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| KENNETH OSMOE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | Sangamon County |
| | ) | |
| v. | ) | No. 16 MR 957 |
| | ) | |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.*, | ) | Honorable |
| | ) | Brian T. Otwell, |
| (Freeman United Coal Mining, Co., Appellee). | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hudson, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held:*  We affirmed the circuit court's judgment confirming the Workers' Compensation Commission's decision finding that the claimant did not sustain an occupational disease arising out of and in the course of his employment and denying the claimant benefits under the Illinois Worker's Occupational Diseases Act (820 ILCS 310/1 *et seq.* (West 2008)).

¶ 2    The claimant, Kenneth Osmoe, appeals from a judgment of the circuit court of Sangamon County, confirming the decision of the Illinois Workers' Compensation Commission

(Commission) which found that he did not sustain an occupational disease arising out of and in the course of his employment for Freeman United Coal Mining Company (Freeman) and denying him benefits under the Illinois Worker's Occupational Diseases Act (Act) (820 ILCS 310/1 *et seq.* (West 2008)). For the reasons which follow, we affirm the judgment of the circuit court.

¶ 3    The following factual recitation is taken from the evidence adduced at the arbitration hearing held on May 28, 2015.

¶ 4    The claimant was 66 years old as of the date of arbitration hearing. He testified that he had worked in the coal-mining industry for 32 years, spending the first 30 years underground, where he was exposed to coal dust, silica dust, rock dust, and the fumes of roof bolt glue. He last worked as a coal miner for Freeman on August 27, 2007, which is the date the Crown II coal mine closed.

¶ 5    According to the claimant, he began his coal-mining career in 1969, working for Monterey Coal Company (Monterey) as a buggy runner. A buggy runner operates a machine that takes the coal from the face of the mine at the continuous miner to the belt so that it can be transported out of the mine. After a year working for Monterey, the claimant left the coal-mining industry and moved to Washington. In 1980, the claimant returned to Illinois and began working for Freeman. After a year working as a buggy runner for Freeman, the claimant took a job as roof bolter. He remained a roof bolter for "a couple of years," until he became a continuous miner operator. In that role, he operated the continuous miner that cut the coal from the face of the mine. He described the continuous miner as "pretty nasty at times," due to the significant amount of dust.

¶ 6     The claimant spent the last three years of his mining career on the surface, where he performed plant maintenance. As part of his duties on the surface, he cleaned the chutes going through the silo that would get blocked. According to the claimant, "nothing but dust" came out when he cleaned the chutes and there was "no way to get away from it." With regard to the dust and rock exposure, the claimant testified that the jobs he performed on the surface were "worse" than being at the face of the mine. Following his career as a coal miner, the claimant worked as a union laborer for 7 years.

¶ 7     The claimant testified that, 10 years into his coal mining career, he started to have difficulty breathing and began to "wheeze" while doing activities. He stated that his breathing problems got "progressively worse" throughout his employment with Freeman, but, since his departure, they have remained "the same." He explained that he now experiences difficulty breathing when doing activities such as riding bikes and mowing the lawn. The claimant testified that he has never smoked cigarettes in his life and his only other medical condition is borderline diabetes. The claimant also testified that, approximately 10 years ago, he won a strong man competition in Mount Olive, Illinois.

¶ 8     The claimant presented the evidence deposition of Dr. Manish Mathur, his family physician. Dr. Mathur testified that, in the course of his practice, he occasionally treated coal miners and former coal miners. He also has treated patients with lung diseases. Dr. Mathur testified that he had treated the claimant four times between July 24, 2007, and August 7, 2012, for various ailments, including shoulder pain, an upper respiratory infection, diarrhea, and a sore tongue. On February 15, 2013, the claimant visited Dr. Mathur, complaining for the first time of wheeze and a daily cough. During that visit, the claimant informed Dr. Mathur that he was undergoing evaluation for "Black Lung," and asked for a referral to Dr. Glennon Paul, a

pulmonologist in the Springfield area. Dr. Mathur conducted a physical examination of the claimant's chest, which revealed normal breath sounds with no rales, rhonchi, wheezes, or rubs.

¶ 9      The claimant saw Dr. Mathur again on September 27, 2013, for a follow-up regarding chronic cough and wheezing. The claimant informed Dr. Mathur that he had "recently" won a Strongman Contest in Mount Olive. Dr. Mathur testified that he did not know what exactly the competition entailed, but he assumed it dealt with heavy exertion of some sort. Dr. Mathur ordered a chest x-ray to evaluate the claimant's chronic cough. According to Dr. Mathur, the chest x-ray was interpreted by Dr. Gene W. Spector, a radiologist, as "negative." The claimant returned to Dr. Mathur on February 11, 2015, during which he complained for the first time of shortness of breath. Dr. Mathur testified that, on clinical exam, the claimant was not audibly wheezing.

¶ 10      During the deposition, Dr. Mathur reviewed his responses to a series of interrogatories that he had previously provided to the claimant's counsel. According to the interrogatories, Dr. Mathur opined that the claimant's treatment records could not be used as a basis for ruling out the existence of chronic bronchitis. Dr. Mathur further opined that, if the claimant does have chronic bronchitis, it was caused or aggravated by his job as a coal miner and further exposure to the coal mining environment would present risks to the claimant's health. Dr. Mathur indicated that there was no x-ray evidence of CWP in the claimant's treatment records. He testified that he is not an expert in radiologic diagnosis of CWP, but he believes it is possible to have CWP that is not detectable on an x-ray but may be detectable via a more sensitive image scan, such as a CT scan. He testified that pathology would "really clinch" the diagnosis of CWP. Dr. Mathur's interrogatories also indicated that the claimant's treatment records could not be cited to rule out the existence of asthma or reactive airways disease. Dr. Mathur further opined that, if the

claimant does have asthma or reactive airways disease, his exposure as a coal miner either caused or aggravated his condition.

¶ 11    The claimant next presented the evidence deposition of Dr. Glennon Paul, the medical director at St. John's Respiratory Therapy and Clinical Assistant Professor of Medicine at SIU Medical School. Dr. Paul testified that he is board certified in asthma, allergy, and immunology. Dr. Paul is not a B-reader, nor is he board certified in pulmonology.

¶ 12    Dr. Paul testified that he examined the claimant on March 4, 2013. The claimant related to Dr. Paul a history of wheezing, coughing, and shortness of breath for "approximately ten years." During his examination of the claimant, Dr. Paul ordered a chest x-ray. He also had the claimant undergo spirometry. The results showed no evidence of obstruction in the testing until after the claimant inhaled methacholine and the claimant did not have a diffusion abnormality. Dr. Paul testified that there was a change in the claimant's FEV1 with methacholine of 14%. Dr. Paul diagnosed the claimant with coal workers pneumoconiosis (CWP), chronic bronchitis, and either asthma or reactive airway disease. Dr. Paul stated that he believes these conditions were either caused, or aggravated in part, by the claimant's exposure to the coal mine environment. Because of these diagnoses, Dr. Paul opined that the claimant could have no further exposure to the coal mine environment without potential progression of his conditions.

¶ 13    With regard to CWP, Dr. Paul testified that he found the claimant's x-ray dated March 4, 2013, to be positive for CWP. Dr. Paul did not assign a profusion rating to the film, nor did he indicate the opacity type that he saw on the film. Dr. Paul opined that, in order to have CWP, one must not only have coal mine dust deposited in his lungs, but also a tissue reaction to it, which is called scarring or fibrosis. The scarring cannot perform the function of normal, healthy lung tissue. By definition, if one has CWP, he has some impairment in the function of the lung at the

site of scarring whether it can be measured by spirometry or not. Dr. Paul testified that it is possible to have CWP that is radiographically significant and have normal pulmonary-function testing, normal blood gases, normal physical examination of the chest, and no shortness of breath. Dr. Paul testified that if an individual has CWP and ends his exposure to coal mine dust, the disease can still progress.

¶ 14   With regard to chronic bronchitis, Dr. Paul testified that a diagnosis of chronic bronchitis does not require sputum but does require a history of coughing, wheezing, and shortness of breath, which are the symptoms the claimant reported. When asked if he had authority for his position that sputum was not required for such a diagnosis, Dr. Paul testified that it was "so mundane and basic" and he knows that it is "written" but does not know where it is written. With respect to Dr. Paul's diagnosis that the claimant had asthma, he testified that the claimant's 14% change in FEV1 with methacholine, along with his history, was a positive test. Dr. Paul acknowledged that "most people" use a guideline that says a 20% change in FEV1 is required to be considered "significant" and, therefore, positive for asthma, but he emphasized that this is a "guideline" and that he prefers to take in "the totalitarian [*sic*] of all findings in a patient."

¶ 15   The claimant also presented the evidence deposition of Dr. Dani Tazbaz, who examined the claimant on October 2, 2009. Dr. Tazbaz is board certified in internal medicine, pulmonary disease, and critical care medicine. He estimated that five to ten percent of his patient census is the care and treatment of former or current coal miners. Dr. Tazbaz conducted a physical examination of the claimant's chest, which was clear. The claimant reported that he experienced shortness of breath, although he also told Dr. Tazbaz that he "could walk a mile." Dr. Tazbaz testified that the claimant's obesity could be a contributing factor to his shortness of breath.

¶ 16    Dr. Tazbaz diagnosed the claimant with CWP and chronic bronchitis, both of which were caused by exposure to coal dust. With regard to CWP, Dr. Tazbaz testified that he based his diagnosis on the claimant's symptoms, which included a cough, and his chest x-ray. Although Dr. Tazbaz testified that he is not a B-reader, he received a report from a B-reader and he agreed with that report, which stated that the x-ray looked positive for CWP. Dr. Tazbaz did not note where the opacities were located in the lungs. Dr. Tazbaz did not know when the chest x-ray he reviewed had been performed, nor did he document the quality of the film. He testified that it is "important" to know the film quality and whether the patient adequately performed the required breathing during the x-ray and that he did not note it because it was not "abnormal." With regard to chronic bronchitis, the claimant reported to Dr. Tazbaz that he had a cough that persisted for a year without sputum production. He also provided a history that included a cough while he was working in the mines that produced black secretions. Dr. Tazbaz acknowledged that the claimant did not have a history of sputum production in the two years after he left the coal mine. According to Dr. Tazbaz, a diagnosis of chronic bronchitis "usually" has sputum production for three months a year for the past two years.

¶ 17    The claimant also presented the chest x-ray reports of two B-readers. Dr. Henry K. Smith, a board certified radiologist and NIOSH B-reader, interpreted an x-ray of the claimant's chest dated March 29, 2009, as positive for CWP, profusion 1/0 with P/S opacities in the bilateral middle and lower lung zones. Dr. Smith interpreted an x-ray of the claimant's chest taken on October 14, 2010, as positive for CWP, profusion 1/1 with P/P opacities in all lung zones. Dr. Smith interpreted a chest x-ray of March 4, 2013, as positive for CWP, category 1/0 with P/P opacities in all lung zones. Dr. Smith also interpreted the claimant's chest CT scan dated October

14, 2010. He noted findings consistent with CWP with P/P opacities in the upper, mid, and lower lung zones bilaterally with a profusion 1/1.

¶ 18    Dr. Michael S. Alexander, a board certified radiologist and B-reader, interpreted the claimant's chest x-rays dated March 29, 2009 and October 14, 2010, as positive for CWP, profusion 1/0 with P/P opacities in all lung zones.

¶ 19    Freeman presented the chest x-ray report of B-reader Dr. James Castle. Dr. Castle, a board certified pulmonologist, interpreted the claimant's chest x-rays dated March 29, 2009 and March 4, 2013. He interpreted the March 29, 2009 x-ray as negative for any findings of CWP. Dr. Castle graded the film to be quality 2 due to improper position. Dr. Castle interpreted the March 4, 2013 x-ray as negative for CWP. He graded that film to be quality 2 due to overexposure.

¶ 20    Freeman next presented the evidence deposition of Dr. Jerome Wiot, who reviewed the claimant's radiographic films at its request. Dr. Wiot is a physician and diagnostic radiologist. He is board certified in radiology and a certified B-reader. He was also the past president of the American College of Radiology and, as a member of the task force on pneumoconiosis, helped develop the weekend symposium that eventually became the B-reader program. Dr. Wiot has been a B-reader since the program's inception in 1970. According to Dr. Wiot, CWP invariably begins in the upper lung zones and moves into the mid and lower lung zone as it progresses.

¶ 21    Dr. Wiot reviewed a PA and lateral x-ray of the claimant's chest dated March 29, 2009. Dr. Wiot graded the film as quality 2 because it was done in relative expiration, meaning that the claimant did not take a "full and complete deep breath and hold it." According to Dr. Wiot, as a result of the underinflation there was some crowding of the bases, which makes it appear as though there are more vascular markings than are actually present. He stated that, when

reviewing such a film, one has to be careful to not "over interpret" what one is seeing in the bases. Dr. Wiot found no evidence of CWP on the film that he reviewed.

¶ 22    Freeman also presented the evidence deposition of Dr. Cristopher Meyer, who reviewed the claimant's chest x-rays and CT scan at its request. Dr. Meyer is a radiologist and a B-reader. Dr. Meyer explained that a B-reader looks at the films of the lung to decide whether there are any small nodular opacities or linear opacities and, based on the size or appearance of the small opacities, assigns the opacities a letter score. Dr. Meyer testified that specific occupational lung diseases are described by specific opacity types. CWP is characteristically described by small round opacities. The distribution of opacities is also described because different pathologies are seen in different regions of the lung. He explained that CWP "is typically an upper zone predominant process." The last component is the extent of the lung involvement or the so-called profusion. Dr. Meyer testified that the profusion defines the density of the small opacities in the lung. Dr. Meyer stated that the distinction between a profusion rating of 1/0 and 0/1 is a critical component of the B-reader examination and he believes is the rating that "trips up most non-radiologists."

¶ 23    The chest x-rays that Dr. Meyer reviewed were dated March 29, 2009, October 14, 2010, and March 4, 2013. The CT scan was dated October 14, 2010. Dr. Meyer graded the chest x-rays of March 29, 2009, and October 14, 2010, as quality 2 due to underinflation, which causes the lungs to "look busier" because the pulmonary vasculature is accentuated. Dr. Meyer opined that the claimant's lungs were "clear" in both films and that there were no findings of CWP. Dr. Meyer graded the March 4, 2013 chest x-ray as quality 2 due to over-exposure, which can make the abnormalities of CWP less apparent. He testified that the claimant's lungs were clear and

there were no findings of CWP. Lastly, Dr. Meyer testified that, although there was some "mild motion" on the claimant's CT scan, there were no findings of CWP.

¶ 24    Freeman presented the deposition of Dr. Jeffrey Selby, who, at its request, reviewed the claimant's medical records and then examined the claimant on October 14, 2010. Dr. Selby is a certified B-reader and board-certified internist and pulmonologist. Dr. Selby testified that the claimant's chief complaint was wheezing and shortness of breath. He examined the claimant's chest and found no abnormalities. Dr. Selby performed spirometry on the claimant and found no evidence of an obstruction. Dr. Selby measured the claimant's lung volumes and, based on those measurements, found no evidence of restriction. The claimant's diffusion capacity was "super normal" at 125% of predicted. Dr. Selby performed exercise testing on the claimant, which revealed no abnormality.

¶ 25    Dr. Selby reviewed the claimant's chest x-rays dated March 29, 2009, and October 14, 2010. Dr. Selby graded the March 29, 2009 film to be quality 2 due to underinflation, which he testified could cause a false positive reading due to increased lung markings that can look like, but are not, scars. He could not find any abnormalities consistent with CWP on the March 29, 2009 chest x-ray. Dr. Selby also graded the October 14, 2010 film as quality 2 for underinflation and his interpretation of that film was the same as the March 29, 2009 film. Dr. Selby also ordered a high resolution CT scan, which both Dr. Selby and Dr. Anthony Perkins, a board-certified radiologist, interpreted as showing no evidence of CWP.

¶ 26    Dr. Selby testified that the claimant did not have any respiratory or pulmonary abnormalities as a result of coal mine dust inhalation or coal mine employment. He opined that that the claimant's obesity was a major, if not the only, cause of the claimant's shortness of breath and wheezing. Dr. Selby also reviewed the deposition of Dr. Tazbaz, in which Dr. Tazbaz

testified that the claimant related a history of cough with sputum production that ended at the time he left the mine and then returned after he had been out of the mine for a year. According to Dr. Selby, this history, if true, indicated that the cough could not relate back to the claimant's coal mine employment. The condition ended after his coal mine employment, indicating that it was temporary.

¶ 27    Dr. Selby testified that he saw the claimant again, at Freeman's request, on March 10, 2014. The claimant underwent a methacholine challenge test under Dr. Selby's direction. Dr. Selby testified that methacholine challenge testing is done to determine whether an individual has asthma. Dr. Selby opined that the methacholine challenge testing is a more valuable test for ruling out asthma rather than for "ruling it in" due to the high number of false positives. The test was done according to the American Thoracic Society's guidelines. According to Dr. Selby, the claimant gave a poor effort, but his best efforts at maximum dose showed that he had, at most, an 11% decline in his FEV1 after the methacholine challenge testing. Dr. Selby testified that a positive test for asthma would produce a change from the baseline FEV1 of 20%. Dr. Selby noted that Dr. Paul conducted the same test and the claimant had a 14% decline in his FEV1. Dr. Selby testified that such a result is still negative and that the claimant did not have asthma.

¶ 28    On July 20, 2015, the arbitrator issued a decision, finding that the claimant did not sustain an occupational disease arising out of and in the course of his employment for Freeman that "manifested itself on August 28, 2007" and denying the claimant benefits under the Act. The arbitrator found the opinions of Drs. Selby, Wiot, and Meyer more persuasive than the opinion of Drs. Paul, Tazbaz, Smith, and Alexander. With regard to CWP, the arbitrator noted that Drs. Smith and Alexander testified inconsistently regarding the March 29, 2009 chest x-ray and that Dr. Smith's interpretations of the chest x-rays was inconsistent with the "usual progression" of

CWP as testified to by Drs. Wiot and Meyer. Lastly, the arbitrator found the claimant's credibility to be "suspect" given the inconsistent testimony regarding when the claimant competed in a Strongman competition.

¶ 29    The claimant sought a review of the arbitrator's decision before the Commission. The Commission issued a unanimous decision on January 28, 2016, affirming and adopting the decision of the arbitrator.

¶ 30    The claimant sought a judicial review of the Commission's decision in the circuit court of Sangamon County. The circuit court entered judgment on August 21, 2018, confirming the Commission's decisions. This appeal followed.

¶ 31    On appeal, the claimant argues that the Commission's determination that he failed to establish that he suffered from an occupational disease arising out of and in the course of his employment was against the manifest weight of the evidence. He maintains that the evidence clearly established that he was diagnosed with CWP, bronchitis, and asthma, all of which arose out of and in the course of his employment as a coal miner. He also argues, as a preliminary matter, that the Commission incorrectly held that he was required to prove that he suffered an occupation disease that manifested itself on August 28, 2007, and, therefore, the Commission's decision should be reversed.

¶ 32    Whether a claimant suffers from an occupational disease that occurred in the course of and arose out of employment presents a question of fact, which we review using the manifest weight standard. *Gross v. Illinois Workers' Compensation Commission*, 2011 IL App (4th) 100615WC, ¶ 21. Thus, we will reverse only if an opposite conclusion is clearly apparent. *Id.* Resolving conflicts in the record, judging the credibility of witnesses, assigning weight to evidence, and drawing reasonable inferences therefrom are matters for the Commission in the

first instance. *Beattie v. Industrial Comm'n*, 276 Ill. App. 3d 446, 449 (1995). Furthermore, we owe substantial deference to the Commission's resolution of medical questions, as its expertise in this realm has long been recognized. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979). It was the claimant's burden in the proceedings below to establish each and every element of his claim by a preponderance of the evidence. *Navistar International Transportation Corp. v. Industrial Comm'n*, 315 Ill. App. 3d 1197, 1202 (2000). It is axiomatic that employment need only be a cause, not the sole or main cause, of a condition for a claimant to recover under the Act. *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 596 (2005).

¶ 33    At the outset, we address the claimant's preliminary argument that the Commission held that he was required to prove an occupation disease that manifested itself on August 28, 2007. Section 310/1(f) of the Act requires that disablement due to occupational disease occur within two years after the last day of the last exposure to the hazards of the disease for compensation to be payable. 820 ILCS 310/1(f) (West 2008). In its written decision, the Commission stated that the claimant "did not sustain an occupational disease arising out of and in the course of his employment for [Freeman] that manifested itself on August 28, 2007." According to the claimant, this statement is incorrect as a matter of law because his statutory period did not run until August 27, 2009. As far as this court can tell, the claimant has failed to raise this issue either before the Commission or the circuit court. The issue is therefore forfeited. See, e.g., *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 414 (2005) ("Arguments not raised before the Commission are waived on appeal."); see also *U.S. Steel Corporation–South Works v. Industrial Comm'n*, 147 Ill. App. 3d 402, 406 (1986) (ruling that an issue raised for the first time in the circuit court "may be considered waived because the circuit court *** has no authority to consider evidence or arguments not presented before the Commission").

¶ 34    Forfeiture aside, we find no merit to the claimant's argument in this regard. As Freeman acknowledged in its brief, the claimant was not required to prove that he had an occupational disease that manifested itself on August 28, 2007. It argues, however, that the Commission's citation to that date is harmless as the evidence of record established that the claimant did not suffer from an occupation disease on any date thereafter. We agree with Freeman.

¶ 35    Turning to the claimant's remaining claims, he argues that the Commission erred in finding that he did not suffer an occupational disease in the form of CWP that arose out of and in the course of his employment with Freeman. We disagree.

¶ 36    The Commission's finding that the claimant failed to establish that he had CWP is amply supported by the evidence. The Commission's conclusion rests upon the opinions of Freeman's experts, Drs. Wiot, Selby, and Meyer, who interpreted all of the x-rays of the claimant's chest, as well as the CT scan of his chest, to be negative for CWP. Additionally, although unmentioned by the Commission, B-reader Dr. Castle also interpreted two chest x-rays as negative for CWP.

¶ 37    Freemans' experts were not unchallenged. Drs. Paul and Tazbaz, as well as B-readers Drs. Smith and Alexander, all found the claimant had CWP. Dr. Paul diagnosed the claimant with CWP based on his reading of a chest x-ray. B-reader Dr. Smith interpreted x-rays of the claimant's chest from March 29, 2009, as positive for CWP with a profusion rating of 1/0 with P/S opacities in the bilateral middle and lower lung zones. Dr. Smith graded the film as quality 2 due to underinflation. Dr. Smith interpreted a chest x-ray of October 14, 2010, as positive for CWP with a profusion rating of 1/1 and P/P opacities in all lung zones. He graded the film to be quality 1. Dr. Smith interpreted a March 4, 2013 chest x-ray as positive for CWP with a profusion rating of 1/0 and P/P opacities in all lung zones. B-reader Dr. Alexander reviewed the March 29, 2009, and October 14, 2010, chest x-rays and he interpreted them both as positive for

CWP with a profusion rating of 1/0 with P/P opacities in all lung zones. Dr. Alexander graded both films as quality 1.

¶ 38    As the foregoing evidence illustrates, the Commission was presented with conflicting medical evidence as to whether the claimant demonstrated CWP. Unless the evidence on one side is so compelling as to render the opposite conclusion clearly apparent, we must defer to the Commission, which, as noted above, is uniquely situated to weigh competing medical evidence and to resolve any evidentiary conflicts. *Long*, 76 Ill. 2d at 566; *Freeman United Coal Mining Co. v. Illinois Workers' Compensation Commission*, 2013 IL App (5th) 12056WC, ¶ 21. The Commission in this case resolved the conflict in the evidence in Freeman's favor, concluding that the x-ray interpretations of the claimant's experts were not persuasive. The Commission noted that Drs. Paul and Tazbaz are not B-readers, nor did Dr. Paul assign the film he reviewed a profusion rating or record an opacity type. The Commission also noted that Drs. Smith and Alexander testified inconsistently regarding their profusion ratings for the same x-rays. Lastly, the Commission noted that Dr. Smith's interpretations were not consistent with the usual progression of CWP, which, according to Drs. Wiot and Meyer, generally begins in the upper lung zones. Given the evidence of record and the Commission's role in weighing such evidence, we cannot say that the opposite conclusion is clearly apparent.

¶ 39    The claimant nevertheless argues that the Commission's decision was against the manifest weight of the evidence because it was "confused" about the evidence concerning CWP in the record. Specifically, the claimant argues that the Commission neglected to mention the findings of one of Freeman's B-readers, Dr. Castle, and that, when all the findings are considered, Freeman's B-readers were more inconsistent than his own. The claimant's argument is unpersuasive. The record shows that the only inconsistency in the findings of Freeman's B-

readers is Dr. Castle's finding that the March 29, 2009 film was grade 2 due to improper position. Drs. Wiot, Meyer, and Selby graded that film quality 2 due to underinflation. In contrast, Drs. Smith and Alexander, the claimant's B-readers, differed in their interpretation of the March 29, 2009 x-ray as to the secondary shape and size of the opacities, what zones the opacities were located, and the quality of the film. They also differed from each other with regard to the October 14, 2010 x-ray as to the profusion rating. Simply put, there was ample evidence for the Commission to determine that Freeman's B-readers testified more consistently.

¶ 40    The claimant also contends that the Commission erred by giving "no weight" to the opinions of Drs. Paul and Tazbaz because they were not B-readers. Additionally, the claimant asserts that a foreign jurisdiction has raised serious questions concerning the reliability of B-readings for use in litigation. See *In re Silica Products Liability Litigation*, 398 F. Supp. 2d 563, 625-26 (S.D. Tex. 2005). Simply put, the record does not support the claimant's contention that the Commission gave "no weight" to the opinions of Drs. Paul and Tazbaz. Although the Commission noted that neither expert was a B-reader, it also noted Dr. Paul's failure to assign the film a profusion rating or record an opacity type. The record also reflects that Dr. Tazbaz could not recall the date or quality of the chest film he reviewed, which he testified was "important" information to know. Moreover, the claimant's reliance on authority calling into question the use of B-readings is somewhat puzzling given that a sizeable portion of the evidence he presented in support of his claim consisted of B-readings. In any event, the claimant cites no compelling rationale to question the use of B-readings in this case.

¶ 41    The claimant next maintains that the Commission erred in failing to find that he suffered from the occupational disease of chronic bronchitis aggravated by exposure to coal dust. The claimant argues that we should reverse the Commission's decision because it failed to state how

it weighed the evidence in its written decision. According to the claimant, although the Commission provided a paragraph summarizing the evidence of chronic bronchitis in its decision, it did not provide an explanation as to why it weighed the evidence the way that it did. We note that the claimant cites no authority for his contention that the Commission's failure to state in its decision how it weighed the competing opinions is grounds for reversal. As such, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (requiring the appellant's argument to include citation to relevant authority); *Ameritech Services, Inc. v. Illinois Workers' Compensation Comm'n*, 389 Ill. App. 3d 191, 208 (2009) (noting that arguments on appeal are forfeited in the absence of supporting legal authority).

¶ 42     We also disagree with the claimant's argument that the Commission's decision that he did not suffer chronic bronchitis arising out of and in the course of his employment as a coal miner is against the manifest weight of the evidence. The claimant's treating physician, Dr. Mathur, testified that the claimant might have chronic bronchitis; however, the claimant did not complain of a daily cough until his February 15, 2013 visit. Dr. Paul diagnosed the claimant with chronic bronchitis, which he attributed to the claimant's coal-mine exposure. Dr. Paul testified that sputum was not required for the diagnosis of chronic bronchitis, but he could not cite any authority to back up his assertion beyond his own expertise. Dr. Tazbaz also diagnosed the claimant with chronic bronchitis, basing his diagnosis on the claimant's history of a productive cough with black secretions that ceased when he was no longer working in the coal mine. Dr. Tazbaz, however, testified that a diagnosis of chronic bronchitis requires sputum production for three months a year for two years. Dr. Tazbaz further testified that the claimant did not have sputum production as of the date of his visit. Dr. Selby testified that, because the claimant's cough and sputum ended with his coal mine employment, his condition was temporary and not a

permanent condition related to his coal-mine exposure. Dr. Selby further testified that the claimant's symptoms could indicate industrial bronchitis. Given the difference of medical opinion, and the fact that the Commission gave greater weight to Dr. Selby's opinions, we cannot say that the Commission finding that the claimant did not establish chronic bronchitis was against the manifest weight of the evidence.

¶ 43   Lastly, the claimant argues that the Commission's decision that he failed to prove that he had asthma as a result of his exposure to coal dust is against the manifest weight of the evidence. The claimant once again argues for reversal based on the Commission's failure to address how it weighed the competing evidence in its written decision. As mentioned above, the claimant has forfeited this argument by failing to cite to any authority. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (requiring the appellant's argument to include citation to relevant authority); *Ameritech*, 389 Ill. App. 3d at 208 (noting that arguments on appeal are forfeited in the absence of supporting legal authority).

¶ 44   That said, the Commission's decision does highlight the evidence regarding the claimant's alleged asthma. As the Commission noted, Dr. Paul diagnosed the claimant with asthma after performing pulmonary function testing on the claimant. Dr. Paul testified that the change in the claimants FEV1 with methacholine was 14%. He further testified that, although "most" physicians require a change of 20% in FEV1 with methacholine to diagnose asthma, he views that number as a "guideline" and not a fixed criterion. Dr. Selby also performed methacholine challenge testing on the claimant. Dr. Selby testified that his test was performed according to the American Thoracic Society's guidelines. Dr. Selby testified that a positive test for asthma would produce a change from the baseline FEV1 of 20%. Dr. Selby testified that the claimant had at most an 11% decline in his FEV1 after the methacholine challenge testing with a

valid effort. Dr. Selby testified that the 14% change reported by Dr. Paul is still a negative result for asthma. According to Dr. Selby, the methacholine challenge testing is a more valuable test for ruling out asthma rather than for "ruling it in" due to the high number of false positives. In light of the foregoing evidence, there was sufficient evidence in the record to support the Commission's conclusion that the claimant failed to prove by a preponderance of the evidence that he suffered from asthma as a result of his career as a coal miner.

¶ 45    For the reasons stated, we affirm the judgment of the circuit court that confirmed the decision of the Commission.

¶ 46    Affirmed.